[No. D047199. Fourth Dist., Div. One. Oct. 10, 2008.]

MEGAN DONOVAN et al., Plaintiffs and Appellants, v.
POWAY UNIFIED SCHOOL DISTRICT et al., Defendants and Appellants.

COUNSEL

Rosenstein, Wilson & Dean, Paula S. Rosenstein, Bridget J. Wilson; Lambda Legal Defense & Education Fund, Inc., F. Brian Chase and Hayley Gorenberg for Plaintiffs and Appellants.

Farmer, Murphy, Smith & Alliston, Murphy, Campbell, Guthrie & Alliston, George E. Murphy, Suzanne M. Nicholson; Stutz, Artiano, Shinoff & Holtz, Jeffery A. Morris, Daniel R. Shinoff and Paul V. Carelli IV for Defendants and Appellants.

OPINION

**NARES, J.—**

### SUMMARY AND HOLDING

Section 220 of the California Education Code[1] prohibits discrimination based on a number of protected characteristics, including sexual orientation, in any program or activity conducted by an educational institution "that receives, or benefits from, state financial assistance or enrolls pupils who receive state student financial aid." In this case, we are called on to determine (1) the elements of a claim under section 220 brought by students against a publicly funded school district for its response to peer sexual orientation harassment suffered by the students while on campus, and (2) whether money damages are available in a private enforcement action under section 262.3, subdivision (b).

We conclude that to prevail on a claim under section 220 for peer sexual orientation harassment, a plaintiff must show (1) he or she suffered "severe, pervasive and offensive" harassment that effectively deprived the plaintiff of the right of equal access to educational benefits and opportunities; (2) the school district had "actual knowledge" of that harassment; and (3) the school district acted with "deliberate indifference" in the face of such knowledge. We further conclude that from the words of section 262.3, subdivision (b), as well as from other markers of legislative intent, money damages are available in a private enforcement action under section 220. Therefore, for reasons we shall explain, we affirm the judgment for plaintiffs.

Plaintiffs Joseph Ramelli and Megan Donovan started as freshmen in 2000 at Poway High School (PHS). Each endured "severe, pervasive and offensive" peer sexual orientation harassment while attending PHS. This harassment, which peaked during their junior year, included, for example, death

---

[1] All further statutory references are to the Education Code unless otherwise specified.

threats; being spit on; physical violence and threats of physical violence; vandalism to personal property; and being subject to antigay epithets such as "fag," "faggot," "fudge packer," "dyke" and "fucking dyke." Both students completed their senior year at PHS through an independent study program offered by the Poway Unified School District (District).

Before filing a lawsuit, plaintiffs and their parents met with defendant Scott Fisher, the PHS principal. Plaintiffs each gave Fisher a log chronicling the harassment they had experienced and/or witnessed during their junior year at PHS. Plaintiffs also complained to defendant Donald Phillips, the superintendent of the District, and to defendant Ed Giles, an assistant principal at PHS, among many other administrators and teachers, about the peer sexual orientation harassment they were enduring at PHS.

The District claims it adequately responded to the harassment experienced by plaintiffs, that plaintiffs provided insufficient information for the District to determine which students on campus were responsible for the harassment, and that plaintiffs rejected various options suggested by the District in response to the harassment. Plaintiffs claim the District's response to the peer sexual orientation harassment was legally insufficient and that despite their complaints they continued to experience severe peer harassment when on campus. Plaintiffs thus sued, alleging both state and federal causes of action.

After a six-week trial, the jury returned a verdict finding (1) the District violated section 220, (2) Fisher and Giles violated Ramelli's rights under the equal protection clause of the United States Constitution, (3) Fisher alone violated Donovan's rights under the equal protection clause of the United States Constitution, and (4) Phillips was not liable. The jury awarded Ramelli and Donovan damages of $175,000 and $125,000, respectively. By stipulation of the parties, the court entered judgment against the District, Fisher, and Giles in favor of Ramelli, and against the District and Fisher in favor of Donovan.

On appeal the District argues the trial court erroneously instructed the jury in connection with the section 220 claim by applying negligence principles derived from the California Fair Employment and Housing Act, Government Code section 12900 et seq. (FEHA), instead of the more stringent elements of liability derived from title IX of the Education Amendments of 1972 (Pub.L. No. 92-318 (June 23, 1972) 86 Stat. 235) (Title IX). Defendants further argue there is no substantial evidence to support the jury's verdict against them.

In their cross-appeal, plaintiffs argue the trial court abused its discretion by refusing to award them attorney fees under Code of Civil Procedure section 1021.5, despite their obtaining an award of attorney fees under title 42 United

States Code section 1988(b), using a multiplier to increase the award in excess of the lodestar figure.

After the case was fully briefed, we ordered the parties to lodge the legislative history of myriad bills enacting or amending provisions of California's antidiscrimination in education law. Based on this legislative history, and the language of the enforcement provisions within that law, in particular sections 262.3 and 262.4, we requested supplemental briefing from the parties regarding whether money damages were available in a private enforcement action under section 220.

We conclude the Legislature intended Title IX's elements to govern an action under section 220. We further conclude the Legislature intended money damages to be available in a private enforcement action. Although the trial court erred by applying the elements of liability from FEHA and not Title IX when it instructed the jury under section 220, we conclude that error is harmless. As the District notes, the elements of liability in connection with plaintiffs' equal protection claims against Fisher are the *same* elements that apply in a Title IX action for money damages, which we hold *also* govern a private suit for damages under section 220.

■ As the PHS principal, Fisher was an "appropriate person" to act on behalf of the District to "address the alleged discrimination and to institute corrective measures" to end the discrimination. (*Gebser v. Lago Vista Independent School Dist.* (1998) 524 U.S. 274, 290–291 [141 L.Ed.2d 277, 118 S.Ct. 1989] (*Gebser*).) Thus, the jury's findings in connection with Fisher also support holding the District liable under section 220 for its *own wrongdoing* based on its legally insufficient response to the harassment, and not, as we shall discuss, based on principles of respondeat superior and/or constructive notice. Because we conclude the record contains substantial evidence to support the jury's findings, we affirm the judgment against defendants.

Finally, we conclude the trial court did not abuse its discretion when it awarded plaintiffs attorney fees under title 42 United States Code section 1988(b), and not under Code of Civil Procedure section 1021.5.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Standard of Review*

When findings of fact are challenged on appeal, we are bound by the substantial evidence rule, which requires us to review the entire record to determine whether substantial evidence supports the appealed judgment.

(*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378].) In so doing, we "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].) If the record demonstrates substantial evidence in support of the judgment, we must affirm even if there is substantial contrary evidence. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874 [197 Cal.Rptr. 925] (*Bowers*).)

### B. Factual Summary[2]

#### 1. Joseph Ramelli

In Ramelli's freshman and sophomore years, students frequently made antigay remarks directly to him or in his presence, using names such as "fag," "faggot," "queer," "homo" and "fudge packer." Ramelli heard these words used in the "halls, the quad, the classrooms, just about anywhere you go" on campus. He was offended by these slurs and they made him feel insecure at school. Toward the end of his freshman year, students threatened Ramelli in physical education class while he was changing his clothes because he was gay or was perceived to be gay.

In the beginning of his sophomore year, Ramelli witnessed a student, Joseph S., whom he had met while attending Gay-Straight Alliance meetings on campus during his freshman year, being badly beaten on campus by another PHS student, presumably because he was gay. This student had previously spoken to Ramelli and others about the antigay peer harassment he was experiencing at PHS.

Ramelli described his junior year as "hell" because of the antigay peer harassment to which he was subjected at PHS. Because he felt the harassment "coming directly" at him "on a more continuous basis," Ramelli was scared at school. The harassment occurred "almost every single day," both inside and outside the classroom. Ramelli told several teachers and administrators, including Fisher and Giles, about the antigay harassment, but it did not stop.

In addition to the antigay language directed at him or witnessed by him "on a more continuous basis," during his junior year, Ramelli was shoved into the lockers while being told, "Watch out, you fucking faggot." The harassment also included being purposely tripped in the hall while called an

---

[2] In light of defendants' challenge to the sufficiency of the evidence, we provide a brief summary of the facts here and a more thorough review of the facts in the substantial evidence discussion, *post.*

antigay name; having his car vandalized while parked at PHS; finding a note left on his car in the PHS parking lot that read, "Keep your eyes to yourself, you fucking faggot," and "[f]aggots need to die. You fucking queer, watch your back!"; finding another note that had been slipped through a crack in his car window while it was parked at PHS, which read, "Fucking faggot, you think that window was an accident? I'm going to kick your fucking ass, faggot"; having two notes affixed to his back during school identifying him as being gay; having water thrown on him to make it look like he had urinated on himself; having food thrown at him while he walked on campus; and being spit on because he was a participant in a campus event called the "Day of Silence," which sought to call people's attention to the violence experienced by gay and lesbian students. Because of the ongoing harassment, Ramelli began to keep a log of incidents he witnessed or experienced on the PHS campus.

As a result of such harassment, Ramelli "cut" classes at school. He also became anxious and depressed, in light of the "name-calling" and "pushing and . . . shoving" from other students; he no longer enjoyed school. Ramelli saw no reason to "put [himself] through [the harassment] every day." Nonetheless, Ramelli intended to return to PHS for his senior year until he got sick and missed the first few weeks of school. He then enrolled in a home-study program offered by the District called "New Directions" to complete his senior year. He graduated from PHS in 2004.

### 2. *Megan Donovan*

Donovan and Ramelli had been friends since the sixth grade. Donovan witnessed PHS students use antigay language almost daily when at school. Initially she was not the target of such language. However, when she began to date a female classmate towards the end of her sophomore year, "about once a week" she experienced antigay harassment from her peers when on campus. Donovan also claimed she did not make the PHS girls' varsity softball team because of her sexual orientation.

This harassment involved name calling and threats of physical violence. At an informal student event known as "Straight Pride Day" in Donovan's junior year, a female student circled Donovan, Ramelli and their group of friends and yelled, "Fucking fags, fuck you guys, stupid d[y]ke, stupid d[y]ke," and "Megan [Donovan] is a fucking d[y]ke."

Like Ramelli, Donovan kept a log during her junior year of the antigay peer harassment she experienced on campus. Donovan also enrolled in the New Directions program to complete her senior year of high school. She did so because PHS administrators did little to curtail the peer antigay harassment she experienced when at school. Donovan also graduated from PHS in 2004.

C. *Procedural Summary*

Plaintiffs originally brought their section 220 claim against the District, Phillips, Fisher and Giles (collectively defendants). The court granted without leave to amend a motion for partial judgment on the pleadings, ruling that section 220 does not apply to individual employee defendants.[3] Plaintiffs' amended complaint named only the District as a defendant in their section 220 cause of action.

Plaintiffs' complaint also asserted causes of action under title 42 United States Code section 1983 against the District, Phillips, Fisher and Giles, alleging violations of plaintiffs' rights to procedural and substantive due process and equal protection under the United States Constitution.[4] Plaintiffs also asserted a claim against the District, Phillips, Fisher and Giles for violation of the Unruh Civil Rights Act, Civil Code sections 51 and 52.

With respect to their section 220 claim, plaintiffs alleged the District did not have an "adequate or effective formal or informal policy to ensure that [PHS] was safe for students who, like [plaintiffs], are gay or lesbian or who are perceived as gay or lesbian," and thus when plaintiffs complained to the individual defendants, they "were deliberately indifferent to [plaintiffs'] safety and none of them took any meaningful action to stop the harassment and discrimination they were suffering." Plaintiffs further alleged defendants' "actions, failures to act, and/or deliberate indifference towards the harassment and discrimination [plaintiffs] suffered were carried out because of their actual or perceived sexual orientation. Through these intentional acts and the acts of deliberate indifference, [plaintiffs] were deprived of the equal rights and opportunities in a public educational institution as guaranteed under the California Education Code Sections 200, 220, 233.5 and 262.4." Although plaintiffs sought injunctive and monetary relief in their causes of action brought under title 42 United States Code section 1983, they sought only money damages in their section 220 claim.

---

[3] This ruling is consistent with federal law, where it is well established that only a funding recipient, and not individuals, can be liable under Title IX. (*Davis v. Monroe County Bd. of Ed.* (1999) 526 U.S. 629, 641–642 [143 L.Ed.2d 839, 119 S.Ct. 1661] (*Davis*).) Plaintiffs have not appealed the court's ruling on the partial motion for judgment on the pleadings.

[4] Because the Fourteenth Amendment to the United States Constitution sets standards of conduct for state and local governments, but does not provide for redress, individuals whose federal rights are violated by a state or local official may seek the protection of this statute, title 42 United States Code section 1983. It provides in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

At the close of plaintiffs' evidence, the court granted defendants' motion for nonsuit as to plaintiffs' Unruh Civil Rights Act claims, their due process claims against the individual defendants, and their claims for punitive damages.[5] Plaintiffs conceded the District was immune from liability on their claims under title 42 United States Code section 1983. The court, however, denied nonsuit as to plaintiffs' equal protection claims against the individual defendants, and plaintiffs' claim against the District for violation of section 220.

Before the jury was instructed, plaintiffs filed with the court a "Memorandum of Law Regarding Jury Instruction for Education Code [section] 220 Violation." Plaintiffs asked the court to analogize to FEHA when adopting the standards of liability for a violation of section 220. In so doing, however, plaintiffs confusingly asserted the "deliberate indifference" standard should apply, although plaintiffs disagreed regarding what level of response was required to avoid liability under that test. Plaintiffs also rejected the "severe, pervasive and offensive" and "actual notice" requirements of Title IX and constitutional claims in favor of FEHA's more lenient negligence standards.

Specifically, plaintiffs asserted deliberate indifference exists if a "school administrator failed to take immediate and appropriate corrective action in response to harassment it knew or should have known about." Plaintiffs created their definition of deliberate indifference by relying on Government Code section 12940, subdivision (j)(1), which holds an employer or its agents liable for failing to take "immediate and appropriate" corrective action in response to harassment between coworkers that the employer knew or should have known about. In contrast, the District argued the definition of deliberate indifference is firmly established under federal law, and is defined as a response that is "clearly unreasonable in light of all the known circumstances."

Outside the presence of the jury, the court observed plaintiffs were proposing jury instructions with two different standards for deliberate indifference: one standard for purposes of their constitutional claims, where federal law is well established, and the other standard for purposes of section 220, based on a FEHA model. The court ruled a FEHA negligence standard of liability, applicable to workplace harassment claims between coworkers, applied to section 220, and omitted the term "deliberate indifference" from the section 220 jury instruction. The court noted the duty of a public school to take affirmative steps to combat discrimination, as set forth in section 201,

---

[5] The court's ruling on the nonsuit motion is not a subject of this appeal.

subdivision (b), was inconsistent with the deliberate indifference standard used by federal courts in cases involving Title IX and/or constitutional claims.

As relevant here, the court instructed the jury as follows:

*Instruction No. 3*: "All pupils have the right to participate fully in the educational process, free from discrimination and harassment. California's public schools have an affirmative obligation to combat racism, sexism and other forms of bias, and a responsibility to provide equal educational opportunity."

*Education Code Section 220—Nature of Action*: "Plaintiffs Megan Donovan and Joseph Ramelli claim that Poway Unified School District discriminated against them because of their sexual orientation in violation of Education Code section 220. That section states, in part: 'No person shall be subjected to discrimination on the basis of sex, . . . or any actual or perceived [sexual orientation] in any program or activity conducted by an educational institution. . . .' "

*Special Instruction No. 2—Education Code Section 220 Harassment*: "Plaintiffs have to prove by a preponderance of the evidence all of the following elements: [¶] (1) Plaintiffs Joseph Ramelli and/or Megan Donovan were subjected to harassment because of their sexual orientation by the intentional conduct of Poway Unified School District's employees and/or students in District's programs or activities; [¶] (2) This alleged conduct was sufficiently severe or pervasive to a reasonable person of the same sexual orientation or sex that it effectively deprived Plaintiffs of equal access to the educational opportunities or benefits provided by Defendant Poway Unified School District; [¶] (3) Defendant Poway Unified School District through its administrative and[/]or supervisorial employees knew or should have known of the alleged harassment described above; and [¶] (4) Defendant Poway Unified School District failed to take immediate and appropriate corrective action; and [¶] (5) As a result of the District's actions, Plaintiffs were harmed."

*Section 1983—Equal Protection—Essential Elements*: "In order to prevail on their Equal Protection claim, Plaintiffs Megan Donovan and/or Joseph Ramelli must prove the following facts by a preponderance of the evidence against Dr. Don Phillips, Scott Fisher or Ed Giles: [¶] (1) Plaintiffs Joseph Ramelli and/or Megan Donovan were subjected to harassment because of their sexual orientation by the intentional conduct of other students consisting of conduct related to Plaintiffs' sexual orientation in the individual Defendant's programs or activities, such as conduct depriving a student of access to

school resources because of the student's sexual orientation; [¶] (2) This alleged conduct was so severe, pervasive, and offensive to a reasonable person of the same sexual orientation that it effectively deprived Plaintiffs of equal access to the educational opportunities or benefits provided by the individual Defendants; [¶] (3) The individual Defendants had actual knowledge of the alleged sexual harassment described above; and [¶] (4) The individual Defendants acted with deliberate indifference to the known acts of harassment.

"Plaintiffs may prove deliberate indifference under this claim for violation of the Equal Protection Clause of the Constitution of the United States by proving that there was an obvious need for training of District employees with respect to sexual orientation or sexual harassment and that the discrimination the plaintiffs faced was a highly predictable consequence of the defendants not providing that training. [¶] Plaintiffs may also prove a violation of the equal protection clause by showing that the individual Defendants failed to enforce its [sic] own policies and regulations in cases of peer harassment of homosexual students in the same way they enforce those policies in cases of peer harassment of heterosexual students."

*Deliberate Indifference*: "[This term] means that the defendant's response to the alleged harassment or lack of response was clearly unreasonable in light of all the known circumstances. A response by the Defendant that is merely inept, erroneous, ineffective, or negligent does not amount to deliberate indifference. However, an official cannot simply turn a blind eye and do nothing and must respond in a prompt, timely and reasonable manner to a Plaintiff's allegations of discrimination. [¶] For deliberate indifference to occur where one student harasses another student, the harassment must take place in a context subject to the individual Defendant's control, and the individual Defendants must have disciplinary authority over the person who is harassing the Plaintiff."

*Acts of Students—Teasing and Name Calling*: "In schools, children may regularly interact in a manner that would be unacceptable for adults. [¶] Consequently, Plaintiffs may not recover damages for harassment for being subjected to such simple acts as teasing and name calling, even where these comments target differences in actual or perceived sexual orientation."

*Single Act of Discrimination Sufficient*: "Plaintiffs may prove more than one discriminatory act against him or her by one or more defendants, but they are not required to do so. Proof of a defendant's single act of intentional discrimination against either or both plaintiffs is sufficient to establish that defendant's liability."

The jury in its special verdict unanimously found both Ramelli and Donovan were subject to sexual orientation harassment by their peers. Ten out of 12 jurors also found the District liable to each plaintiff under section 220 for failing to "to take immediate and appropriate corrective action" in response to such harassment.

With respect to Fisher and Giles, nine out of 12 jurors found them individually liable on Ramelli's equal protection claim, and 10 out of 12 jurors found Fisher liable on Donovan's equal protection claim. The jury, however, rejected plaintiffs' claims of sexual orientation discrimination against Phillips, Fisher and Giles; rejected Donovan's claim her sexual orientation was a motivating factor for not making the girls' varsity softball team; and rejected liability against Phillips.

Defendants moved for a new trial, including on the ground a juror concealed a preexisting bias against the District during voir dire. The trial court denied defendants' motion.

Plaintiffs filed a motion for attorney fees based on Code of Civil Procedure section 1021.5 and on title 42 United States Code section 1988. The court granted the attorney fees motion under title 42 United States Code section 1988 and awarded plaintiffs $421,357, but denied plaintiffs fees under Code of Civil Procedure section 1021.5. Plaintiffs also were awarded costs in the amount of $29,040.68.

Defendants appealed the judgment, including the award to plaintiffs of attorney fees. Defendants, however, abandoned their appeal of the attorney fee award, except to the extent a reversal of the judgment would negate that award. Plaintiffs cross-appealed that portion of the judgment denying them attorney fees under Code of Civil Procedure section 1021.5.

## DISCUSSION

### I. *LIABILITY FOR DAMAGES UNDER SECTION 220*

#### A. *Standard of Review*

We apply an independent standard of review to the trial court's interpretation of section 220 and the elements of liability that apply to a private suit for damages. (See *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]; *Bialo v. Western Mut. Ins. Co.* (2002) 95 Cal.App.4th 68, 76–77 [115 Cal.Rptr.2d 3].) This same standard of review governs whether money damages are available under

section 262.3, subdivision (b) as a remedy for violation of section 220. (See *Chambers v. Kay* (2002) 29 Cal.4th 142, 148 [126 Cal.Rptr.2d 536, 56 P.3d 645].)

## B. *The Language of Relevant Provisions of the Education Code*

Section 220 sets forth the prohibition of discrimination. It provides: "No person shall be subjected to discrimination on the basis of disability, gender, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance or enrolls pupils who receive state student financial aid."[6]

■ There is no dispute here that the District is a recipient of state education funding for purposes of section 220. Defendants also do not dispute that a state funding recipient can be liable for peer sexual orientation harassment, even if a recipient does not itself engage in harassment directly, if its response was "clearly unreasonable in light of the known circumstances" (*Davis, supra,* 526 U.S. at p. 648) and "subjected" a person to "discrimination" for purposes of section 220 (§ 220). Instead, the questions we must answer are whether a private enforcement action under section 220 includes recovery of money damages and, if so, what level of response is required of a funding recipient to avoid liability.

■ In resolving these issues, we first look to the statutes' words, as those " ' "generally provide the most reliable indicator of legislative intent." ' " (*Bernard v. Foley* (2006) 39 Cal.4th 794, 804 [47 Cal.Rptr.3d 248, 139 P.3d 1196]; see also *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539] (*Diamond*).) If the words are "clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it." (*Diamond, supra,* 19 Cal.4th at p. 1047.) " 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citation.]" (*Ibid.*; see also *Lennane v. Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976].)

In interpreting a statute, "we strive to give effect and significance to every word and phrase." (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1284 [48 Cal.Rptr.3d 183, 141 P.3d 288].) "We give the words of a

---

[6] Added by the Legislature in 2007, section 219 expands the characteristics entitled to protection under these antidiscrimination laws to "include[] a perception that the person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics."

statute their ordinary and usual meaning and construe them in the context of the statute as a whole." (*American Liberty Bail Bonds, Inc. v. Garamendi* (2006) 141 Cal.App.4th 1044, 1052 [46 Cal.Rptr.3d 541].) "We must presume that the Legislature intended 'every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function.' " (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906], quoting *Clements v. T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5].)

■ An interpretation of section 220 requires consideration of various other provisions in the Education Code, including section 200,[7] which sets forth the state's antidiscrimination policy; section 201, which contains legislative declarations in support of that policy;[8] and sections 262.3 and 262.4,

---

[7] Section 200 provides: "It is the policy of the State of California to afford all persons in public schools, regardless of their disability, gender, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, equal rights and opportunities in the educational institutions of the state. The purpose of this chapter is to prohibit acts that are contrary to that policy and to provide remedies therefor."

[8] Section 201 states: "(a) All pupils have the right to participate fully in the educational process, free from discrimination and harassment. [¶] (b) California's public schools have an affirmative obligation to combat racism, sexism, and other forms of bias, and a responsibility to provide equal educational opportunity. [¶] (c) Harassment on school grounds directed at an individual on the basis of personal characteristics or status creates a hostile environment and jeopardizes equal educational opportunity as guaranteed by the California Constitution and the United States Constitution. [¶] (d) There is an urgent need to prevent and respond to acts of hate violence and bias-related incidents that are occurring at an increasing rate in California's public schools. [¶] (e) There is an urgent need to teach and inform pupils in the public schools about their rights, as guaranteed by the federal and state constitutions, in order to increase pupils' awareness and understanding of their rights and the rights of others, with the intention of promoting tolerance and sensitivity in public schools and in society as a means of responding to potential harassment and hate violence. [¶] (f) It is the intent of the Legislature that each public school undertake educational activities to counter discriminatory incidents on school grounds and, within constitutional bounds, to minimize and eliminate a hostile environment on school grounds that impairs the access of pupils to equal educational opportunity. [¶] (g) It is the intent of the Legislature that this chapter shall be interpreted as consistent with Article 9.5 (commencing with Section 11135) of Chapter 1 of Part 1 of Division 3 of Title 2 of the Government Code, Title VI of the federal Civil Rights Act of 1964 (42 U.S.C. Sec. 1981, et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. Sec. 1681, et seq.), Section 504 of the federal Rehabilitation Act of 1973 (29 U.S.C. Sec. 794(a)), the federal Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 et seq.), the federal Equal Educational Opportunities Act (20 U.S.C. Sec. 1701, et seq.), the Unruh Civil Rights Act (Secs. 51 to 53, incl., Civ. C.), and the Fair Employment and Housing Act (Pt. 2.8 (commencing with Sec. 12900), Div. 3, Gov. C.), except where this chapter may grant more protections or impose additional obligations, and that the remedies provided herein shall not be the exclusive remedies, but may be combined with remedies that may be provided by the above statutes."

which provide for enforcement of the antidiscrimination law.[9] As statutes "in pari materia," meaning "of the same matter" or "on the same matter" (*Altaville Drug Store, Inc. v. Employment Development Department* (1988) 44 Cal.3d 231, 236, fn. 4 [242 Cal.Rptr. 732, 746 P.2d 871]), they must be interpreted together (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 124, fn. 4 [253 Cal.Rptr. 1, 763 P.2d 852]; *Hicks v. E.T. Legg & Associates* (2001) 89 Cal.App.4th 496, 505 [108 Cal.Rptr.2d 10] [A " 'statute is not to be read in isolation,' " but rather " 'it must be construed with related statutes and considered in the context of the statutory framework as a whole' "]; *Estate of Burden* (2007) 146 Cal.App.4th 1021, 1028 [53 Cal.Rptr.3d 390] [legislation "on the same or similar subjects" may be examined to ascertain legislative intent]).

█ Section 201, subdivision (g) references Title IX and FEHA, along with other state and federal laws (including Gov. Code, § 11135 et seq. & tit. VI of the federal Civil Rights Act of 1964, 42 U.S.C. § 1981 et seq.), which are to be used as interpretive aids when construing the antidiscrimination provisions within that chapter.

█ On the issue of damages, subdivision (b) of section 262.3 recognizes the availability of "civil law remedies, including, but not limited to, injunctions, restraining orders, or other remedies" in a private enforcement action, the right to which is codified in section 262.4. The Legislature, however, did not define the term "civil law remedies." However, as discussed, *post*, we conclude the plain meaning of the words "civil law remedies" contained in section 262.3, subdivision (b) includes money damages. Although we normally do not consider the remedies available for violation of a statute until after we determine that a violation exists, we make an exception here because plaintiffs sought only money damages in their section 220 claim against the

---

[9] Section 262.3: "(a) A party to a written complaint of prohibited discrimination may appeal the action taken by the governing board of a school district pursuant to this article, to the State Department of Education. [¶] (b) Persons who have filed a complaint, pursuant to this chapter, with an educational institution shall be advised by the educational institution that *civil law remedies, including, but not limited to, injunctions, restraining orders, or other remedies or orders may also be available to complainants.* The educational institution shall make this information available by publication in appropriate informational materials. [¶] (c) Nothing in this chapter shall be construed to require an exhaustion of the administrative complaint process before civil law remedies may be pursued. [¶] (d) Notwithstanding any other provision of law, a person who alleges that he or she is a victim of discrimination may not seek civil remedies pursuant to this section until at least 60 days have elapsed from the filing of an appeal to the State Department of Education pursuant to Chapter 5.1 (commencing with Section 4600) of Division 1 of Title 5 of the California Code of Regulations. The moratorium imposed by this subdivision does not apply to injunctive relief and is applicable only if the local educational agency has appropriately, and in a timely manner, apprised the complainant of his or her right to file a complaint." (Italics added.) Section 262.4 states: "This chapter may be enforced through a civil action."

District. If such damages are unavailable, the parties' dispute over the elements of a claim under section 220 would be moot.

### C. Whether Money Damages Are Available for a Violation of Section 220

As noted *ante*, in interpreting a statute we first look to its words because they are the most reliable indicator of legislative intent. (*Stephens v. County of Tulare* (2006) 38 Cal.4th 793, 801–802 [43 Cal.Rptr.3d 302, 134 P.3d 288]; *Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145 Cal.App.4th 220, 231 [51 Cal.Rptr.3d 527].) If there is no uncertainty in the language, the plain meaning controls, and there is no need to resort to extrinsic aids such as legislative history to determine the statute's true meaning. (*Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1261 [8 Cal.Rptr.3d 532, 82 P.3d 740]; *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].)

To determine the common or plain meaning of the words "civil law remedies" in section 262.3, subdivision (b), a court may look to dictionaries. (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 302 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) Black's Law Dictionary defines the word "remedy" as the "means of enforcing a right or preventing or redressing a wrong; legal or equitable relief.—Also termed *civil remedy*." (Black's Law Dict. (8th ed. 2004) p. 1320, col. 1.) Black's Law Dictionary goes on to observe that a remedy " 'is anything a court can do for a litigant who has been wronged or is about to be wronged' " and that the " 'two most common remedies are judgments that plaintiffs are entitled to collect sums of money from defendants and orders to defendants to refrain from their wrongful conduct or to undo its consequences.' " (*Ibid.*, quoting 1 Laycock, Modern American Remedies (3d ed. 2002).) Giving the words "civil law remedies" their plain and commonsense meaning (*Green v. State of California* (2007) 42 Cal.4th 254, 260 [64 Cal.Rptr.3d 390, 165 P.3d 118]), shows the Legislature intended money damages to be available in a private enforcement action under section 262.3.

■ "But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) "An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in

isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed . . . ." (*Ibid.*; see also *Metropolitan Water Dist. v. Adams* (1948) 32 Cal.2d 620, 630–631 [197 P.2d 543].)

■ Here, interpreting the words "civil law remedies" in section 262.3, subdivision (b) to provide for only injunctive relief would render portions of subdivision (d) of section 262.3 superfluous, and would thus violate the maxim of statutory construction that " '[c]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage.' " (*Reno v. Baird* (1998) 18 Cal.4th 640, 658 [76 Cal.Rptr.2d 499, 957 P.2d 1333]; see *Burks v. Kaiser Foundation Health Plan, Inc.* (2008) 160 Cal.App.4th 1021, 1027 [73 Cal.Rptr.3d 257].)

Specifically, subdivision (d) of section 262.3 requires a 60-day "cooling off period" before civil remedies may be pursued by private enforcement. This moratorium, which commences upon the filing of an appeal to the State Department of Education, does *not* apply, however, when injunctive relief is sought. (*Ibid.*) If the term "civil law remedies" were construed to be limited to only injunctive relief (and thus to exclude money damages), the statutory language in subdivision (d)—lifting the moratorium when injunctive relief is sought—would be surplusage, a result we seek to avoid in statutory construction. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1023 [32 Cal.Rptr.3d 89, 116 P.3d 550] [a construction that renders some statutory language surplusage or redundant is to be avoided].)

Moreover, under the plain meaning rule we also look to provisions relating to the same subject matter as section 220. (See *Lungren v. Deukmejian, supra*, 45 Cal.3d at p. 735.) One such provision is Government Code section 11135, which is one of the state laws included in the declaration of intent in Education Code section 201, subdivision (g). In addition, as discussed *post*, the legislative history of section 220 shows the Legislature relied on section 11135 of the Government Code when it enacted Education Code sections 200 and 220.[10] (Sen. Com. on Education, Staff Analysis of Assem. Bill No. 3133 (1981–1982 Reg. Sess.) as amended June 29, 1982.)

Section 11135, subdivision (a) of the Government Code is similar to section 220, and reads in part: "No person in the State of California shall, on the

---

[10] Education Code sections 260 and 261 both reference Government Code section 11138, which requires state agencies subject to Government Code section 11135 to adopt "rules and regulations as are necessary to carry out the purpose and provisions of this article." (Gov. Code, § 11138.) Education Code section 260 requires a state-funded school district to monitor "compliance with any and all rules and regulations promulgated pursuant to section 11138 of the Government Code," and Education Code section 261 adopts existing regulations and procedures promulgated under the Government Code.

basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency . . . ."

When originally enacted in 1977, Government Code section 11135, much like Education Code section 220 when it was first enacted in 1982, did not include an express private right of action. In *Arriaga v. Loma Linda University* (1992) 10 Cal.App.4th 1556 [13 Cal.Rptr.2d 619] (*Arriaga*), the court declined to imply a private right of action under Government Code section 11135 and affirmed summary judgment for the defendant. In so doing, the court declined to follow the decision of the United States Ninth Circuit Court of Appeals in *Greater Los Angeles Council on Deafness v. Zolin* (9th Cir. 1987) 812 F.2d 1103, which had interpreted Government Code section 11135 to imply a private right of action. The court in *Arriaga* reasoned there was no need to imply a private right of action in this statute because the federal civil rights laws already afforded an individual a private civil action, Government Code section 11135 was enacted as an *"alternative* to private lawsuits," and if the Legislature wanted to create an express private cause of action, it certainly knew how to, as evidenced by the Legislature's addition of an express right of action under the Fair Employment Practice Act, the precursor to FEHA. (*Arriaga, supra*, 10 Cal.App.4th at pp. 1563–1564.)

In response to *Arriaga*, the Legislature, in Assembly Bill No. 1670 (1999–2000 Reg. Sess.) amended Government Code section 11139 to expressly provide for a private right of action, but expressly limited enforcement to a "civil action for *equitable relief*." (Legis. Counsel's Dig., Assem. Bill No. 1670 (1999–2000 Reg. Sess.), italics added.) With the passage of Assembly Bill No. 677 (2001–2002 Reg. Sess.), the Legislature in 2001 further amended Government Code section 11139 by adding the words "which shall be independent of any other rights and remedies" at the end of the sentence concluding with the words "equitable relief." This amendment was necessary to clarify a victim of discrimination "need not pursue administrative or any other remedies prior to, or instead of, bringing an action for equitable relief, nor would any victim be required to elect one remedy." (Assem., 3d reading analysis of Assem. Bill No. 677 (2001–2002 Reg. Sess.) as amended Apr. 25, 2001, p. 3.)

As a result of these amendments, the fourth paragraph of Government Code section 11139 reads: "This article and regulations adopted pursuant to this article may be enforced by a civil action for equitable relief, which shall be independent of any other rights and remedies."

■ Government Code section 11139 demonstrates that when the Legislature wanted to limit the remedies available in a private enforcement action to equitable or injunctive relief, it clearly knew how to do so. In contrast to Government Code section 11139, Education Code section 262.3, subdivision (b) speaks in terms of *"civil law remedies, including, but not limited to,* injunctions, restraining orders, or *other remedies* or orders." (Italics added.) Use of these words in section 262.3, subdivision (b) clarifies the Legislature intended the relief available under section 220 to be broader than injunctive relief and to include money damages.

Moreover, the Legislature has declared its intent in section 201, subdivision (g) that the antidiscrimination in education law "shall be interpreted as consistent with" Title IX, and that "the remedies provided herein shall not be the exclusive remedies, but may be combined with remedies that may be provided by the above statutes." (§ 201, subd. (g).) "Where, as here, California law is modeled on federal laws, federal decisions interpreting substantially identical statutes are unusually strong persuasive precedent on construction of our own laws." (*Kamen v. Lindly* (2001) 94 Cal.App.4th 197, 203 [114 Cal.Rptr.2d 127]; see also *Reno v. Baird, supra,* 18 Cal.4th at p. 647 [this rule of construction applied in interpreting FEHA, which is patterned on tit. VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e et seq.)].)

As discussed *post,* when sections 201 and 262.3 were amended in 1998, the United States Supreme Court *already* had decided that a private right of action for money damages existed under Title IX. (See, e.g., *Franklin v. Gwinnett County Public Schools* (1992) 503 U.S. 60, 63–64 [117 L.Ed.2d 208, 112 S.Ct. 1028] *(Franklin); Gebser, supra,* 524 U.S. at pp. 280–281.) The legislative history of the antidiscrimination in education provisions, discussed *post,* confirms the Legislature was aware of the availability of money damages under Title IX when it amended section 262.3. (See Assemblymember Sheila Kuehl, letter to Appropriations Com., May 29, 1997 [asking for support for Assem. Bill No. 499 (1997–1998 Reg. Sess.), by noting the bill "would bring California into conformity with Federal statute by clarifying that damages are a remedy available to students pursuing civil litigation"]; see also Assem. Com. on Judiciary, Analysis of Assem. Bill No. 499 (1997–1998 Reg. Sess.) as amended Apr. 9, 1997, p. 1 [asking whether the remedies for discrimination in education should be "made consistent with federal law to include the availability of monetary damages" (capitalization omitted)].) Interpreting the words "civil law remedies" to include money

damages thus ensures state law is consistent with the remedies available under Title IX, on which section 220 is based.[11] (See § 201, subd. (g).)

### D. *Elements of a Cause of Action for Money Damages Under Section 220*

Section 220 is silent regarding the elements a plaintiff must allege to state a claim for its violation. We thus look to extrinsic aids to resolve this issue, including the legislative history of the various statutes. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 579 [110 Cal.Rptr.2d 809, 28 P.3d 860]; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

After the parties' initial briefing, we requested they lodge the legislative histories of various bills[12] effecting sections 200, 201, 220, 262.3 and 262.4, which we consider together in ascertaining legislative intent. (See *Droeger v. Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 50 [283 Cal.Rptr. 584, 812 P.2d 931].)

The District argues the legislative history shows the Legislature intended Title IX law to govern a private right of action for damages under section

---

[11] We also considered the legislative history of the antidiscrimination in education enforcement provisions. When introduced in 1997, Assembly Bill No. 499 (1997–1998 Reg. Sess.) initially included the words "damages" and "or other remedies" in the list of civil remedies available under section 262.3. When Assembly Bill No. 499 passed to the Senate in July 1998, the references to "damages" in sections 262.3 and 262.4 were removed, but the words "or other remedies" were kept in subdivision (b) of section 262.3. (Assem. Bill No. 499 (1997–1998 Reg. Sess.) as amended July 9, 1998, p. 15.) As defendants acknowledge in their supplemental brief, on the one hand the words "or other remedies" in subdivision (b) of section 262.3 can be interpreted to *include* money damages, which would support the availability of monetary relief despite the Legislature's removal of references to damages in the statutes. On the other hand, the deletion of the word "damages" from sections 262.3 and 262.4 can be interpreted as indicative of the Legislature's intent to *exclude* monetary relief in a private enforcement action. Thus, as defendants correctly note, "[i]t is debatable whether 'other remedies' [in subdivision (b) of section 262.3] was simply a substitute for the term 'damages,' as implied by those analyses indicating an intent to *clarify* that damages were an available remedy, or whether the language was an express *rejection* of the availability of damages as a remedy." The legislative history thus provides little guidance on this particular issue.

[12] Specifically, the parties submitted the legislative histories of Assembly Bill No. 3133 (1981–1982 Reg. Sess.), adding sections 200 and 220; Assembly Bill No. 3653 (1987–1988 Reg. Sess.), adding former section 265, which would later become section 262.3; Senate Bill No. 1854 (1989–1990 Reg. Sess.), repealing section 265 and adding section 262.3; Assembly Bill No. 2359 (1991–1992 Reg. Sess.), amending section 262.3; Assembly Bill No. 2543 (1993–1994 Reg. Sess.), amending section 201; Assembly Bill No. 499 (1997–1998 Reg. Sess.), amending sections 200, 201, 220, 262.3 and adding section 262.4; Assembly Bill No. 537 (1999–2000 Reg. Sess.), amending sections 200 and 220; Senate Bill No. 1234 (2003–2004 Reg. Sess.), amending sections 200 and 220; and Senate Bill No. 777 (2007–2008 Reg. Sess.), amending sections 200 and 220.

220, and thus intended that, for liability to attach under section 220, an educational institution receiving public funds must have, among other elements, "actual knowledge" of discrimination and have acted with "deliberate indifference" in the face of such knowledge. According to the District, because FEHA imposes liability based on principles of respondeat superior and/or "constructive knowledge," FEHA is incompatible with section 220, which, like Title IX, ties the receipt of public funding to its prohibition against discrimination.

Plaintiffs contend the legislative history shows the Legislature intended to provide public school children with "robust" protections from bias-related harassment. According to plaintiffs, the "actual knowledge" and "deliberate indifference" standards of liability in a Title IX claim for money damages are irreconcilable with the legislative history and laws requiring a recipient of state funds to take affirmative steps to curb bias-related harassment in public schools. (See, e.g., § 201, subd. (b).) Plaintiffs therefore contend the "more aggressive" FEHA standard applies to section 220.

The legislative history shows that, beginning in 1982 with Assembly Bill No. 3133 (1981–1982 Reg. Sess.) when sections 200 and 220 were originally enacted, and at least through 1998 as evidenced by Assembly Bill No. 499 (1997–1998 Reg. Sess.), the Legislature relied on Title IX and developing federal law to shape California's own antidiscrimination laws. (See, e.g., Sen. Com. on Education, Staff Analysis of Assem. Bill No. 3133 (1981–1982 Reg. Sess.) as amended June 29, 1982 [noting Tit. IX "contains provisions parallel to much of [Assem. Bill No.] 3133"]; Assem. Com. on Higher Education, background information on Assem. Bill No. 821 (1995–1996 Reg. Sess.) (a precursor to Assem. Bill No. 499) [noting that § 220, part of the Sex Equity in Education Act, was "modeled on federal law, specifically title IX of the 1972 Education Amendments" and that federal courts "have held that a private right of action exists under Title IX and that the Sex Equity in Education Act was adopted to provide the same rights to California students under state law"].)

Conversely, there is little or no support in the legislative history showing the Legislature based the antidiscrimination provisions in the Education Code on FEHA and its statutory framework, as plaintiffs argue. (See *Jones v. The Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1169 [72 Cal.Rptr.3d 624, 177 P.3d 232] [noting the *absence* of legislative history to be of significance in deciphering legislative intent].) We thus turn to an analysis of Title IX and its well-established body of case law regarding the elements of a claim for money damages for discrimination in an educational setting.

### 1. *Development of a Private Right of Action Under Title IX*

■ Title IX prohibits sex discrimination under any education program or activity receiving federal funds. Title IX provides in part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." (20 U.S.C. § 1681(a).) The express means of enforcement of Title IX is administrative: "The statute directs federal agencies that distribute education funding to establish requirements to effectuate the nondiscrimination mandate, and permits the agencies to enforce those requirements through 'any . . . means authorized by law,' including ultimately the termination of federal funding." (*Gebser, supra,* 524 U.S. at pp. 280–281; see also 20 U.S.C. § 1682.)[13]

■ As was the case when sections 200 and 220 were *originally* enacted in 1982 in Assembly Bill No. 3133 (1981–1982 Reg. Sess.), Title IX does not expressly include a private right of action.[14] (See *Cannon v. University of Chicago* (1979) 441 U.S. 677, 683 [60 L.Ed.2d 560, 99 S.Ct. 1946] (*Cannon*).) The United States Supreme Court in *Cannon* held Congress must have intended Title IX to include a private right of action to achieve the policy objectives of Title IX, including preventing use of federal resources to support discriminatory practices, and providing citizens effective protection against such practices. (*Cannon, supra,* at p. 704.) Because the first policy objective normally would be met through termination of federal funding, and because that "remedy is, however, severe and often may not provide an appropriate means of accomplishing the second purpose if merely an isolated

---

[13] Title 20 United States Code section 1682 provides in part: "Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity . . . is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. . . . Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement . . . or (2) by any other means authorized by law: *Provided, however*, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." (Italics added.)

[14] In 1988 the Legislature added a private right of action in Assembly Bill No. 3653 (1987–1988 Reg. Sess.), which was originally codified in former section 265. The Legislature in 1988 made a nonsubstantive change to the private enforcement provisions in Assembly Bill No. 1854 (1989–1990 Reg. Sess.), when it repealed section 265 and adopted the language from the repealed section to create subdivision (b) of section 262.3. In 1998 the Legislature amended section 262.3 and added section 262.4 in Assembly Bill No. 499 (1997–1998 Reg. Sess.).

violation has occurred" (*id.* at pp. 704–705, fn. omitted), the court concluded a private remedy was "fully consistent with—and in some cases even necessary to—the orderly enforcement of" that statute (*id.* at p. 706).

The court also relied on title VI of the Civil Rights Act of 1964[15] to support a private right of action under title IX. In so doing, the court noted Title IX was based on title VI, and, before enactment of Title IX, a private right of action had been implied in title VI actions. (*Cannon, supra,* 441 U.S. at pp. 694–696.)

The court in a series of decisions after *Cannon* outlined the contours of the implied private right of action under Title IX. In *Franklin, supra,* 503 U.S. at pages 63–64, the court held money damages were available for violation of Title IX. There, a high school student alleged that her teacher sexually harassed and abused her; that school personnel knew of the harassment; and that school personnel failed to stop it, and even discouraged her from pressing charges against the teacher. (*Franklin, supra,* at pp. 63–64.) Because the plaintiff in *Franklin* alleged the school district had actual knowledge of the teacher's misconduct, the court did not address whether principles of respondeat superior and/or constructive notice applied in a Title IX action for money damages.

Approximately six years later, while Assembly Bill No. 499 (1997–1998 Reg. Sess.) was being debated in the Legislature, the court in *Gebser* held a high school student could not recover damages against a school district under Title IX for sexual abuse by the student's teacher "unless an official of the school district[,] who at a minimum has authority to institute corrective measures on the district's behalf[,] has actual notice of, and is deliberately indifferent to, the teacher's misconduct." (*Gebser, supra,* 524 U.S. at p. 277.) In so holding, the court again looked to title VI as a guide, and confirmed both Title IX and title VI "operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." (*Gebser, supra,* at p. 286, citing 42 U.S.C. § 2000d et seq.)

---

[15] Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

■ Conversely, the court distinguished Title IX and its statutory framework from Title VII,[16] FEHA's federal counterpart. (*Reno v. Baird, supra,* 18 Cal.4th at p. 647 [California courts often look to Title VII for assistance in interpreting FEHA, in light of parallel policy objectives].) Title VII pertains to an "employer," which is defined to include " 'any agent.' " (*Gebser, supra,* 524 U.S. at p. 283, citing 42 U.S.C. § 2000e-2(b).) Title VII thus invokes agency principles to shape liability under that statute, whereas Title IX "contains no comparable reference to an educational institution's 'agents,' and so does not expressly call for application of agency principles." (*Gebser, supra,* at p. 283.)

Moreover, *Gebser* observed Title VII, unlike Title IX, applies "without regard to federal funding and aims broadly to 'eradicat[e] discrimination throughout the economy.' " (*Gebser, supra,* 524 U.S. at p. 286, quoting *Landgraf v. USI Film Products* (1994) 511 U.S. 244, 254 [128 L.Ed.2d 229, 114 S.Ct. 1483].) Title VII also "seeks to 'make persons whole for injuries suffered through past discrimination,' " and thus "aims centrally to compensate victims of discrimination," whereas Title IX "focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds." (*Gebser, supra,* at p. 287.) That difference, the court noted, "might explain why, when the Court first recognized the implied right under Title IX in *Cannon,* the opinion referred to injunctive or equitable relief in a private action [citation], but not to a damages remedy." (*Gebser, supra,* at p. 287.)

■ The court concluded the "contractual nature" of Title IX also affected the remedies available under the statute: "If a school district's liability for a teacher's sexual harassment rests on principles of constructive notice or *respondeat superior,* it will likewise be the case that the recipient of funds was unaware of the discrimination." (*Gebser, supra,* 524 U.S. at p. 287.) However, because Title IX's "express means of enforcement—by administrative agencies—operates on an assumption of actual notice to officials of the funding recipient" (*Gebser, supra,* at p. 288), it would be an "unsound" policy for a statute's system of enforcement to require, among other conditions, actual notice to the recipient and the opportunity for the recipient to comply voluntarily with Title IX, on the one hand, while, on the other hand, allowing for "substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice." (*Gebser, supra,* at p. 289.)

---

[16] Title VII states in part: "It shall be an unlawful employment practice for an employer . . . [¶] . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." (42 U.S.C. § 2000e-2(a)(1).)

Thus, *Gebser* rejected enforcement of Title IX based on agency principles, absent further direction from Congress, and instead adopted the requirement of actual notice to an "appropriate person" with the opportunity to remedy any violation. At a minimum, an "appropriate person" is an official who "has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" to end the discrimination. (*Gebser, supra*, 524 U.S. at p. 290, citing 20 U.S.C. § 1682.) Because the district did not have actual notice of the teacher's sexual abuse of a student, no liability resulted. (*Gebser, supra*, at p. 291.)

*Gebser* also ruled the response by the "appropriate person" to actual knowledge of discrimination "must amount to deliberate indifference." (*Gebser, supra*, 524 U.S. at p. 290.) It reasoned the administrative enforcement scheme of Title IX is generally on the same level as the deliberate indifference standard: "The premise, in other words, is an official decision by the recipient not to remedy the violation." (*Gebser, supra*, at p. 290.) Absent this rough parity, "there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." (*Id.* at pp. 290–291.) It was these considerations that previously had led the court to adopt the deliberate indifference standard for constitutional violations made actionable under title 42 United States Code section 1983. (*Gebser, supra*, at p. 291, citing, among other authorities, *Canton v. Harris* (1989) 489 U.S. 378, 388–392 [103 L.Ed.2d 412, 109 S.Ct. 1197].)

The *Gebser* court refused to hold the district liable even though it allegedly did not comply with regulations promulgated by the Department of Education requiring the district to adopt and publish procedures " 'providing for prompt and equitable resolution' of discrimination complaints." (*Gebser, supra*, 524 U.S. at p. 291, quoting 34 C.F.R. § 106.8(b) (1997).) The district's lack of administrative compliance, while not actionable under Title IX, was subject to enforcement by the Department of Education. (*Gebser, supra*, at p. 292, citing 20 U.S.C. § 1682.)

A year after deciding *Gebser*, the court examined whether the cause of action under Title IX would support recovery of damages for peer sexual harassment. (*Davis, supra*, 526 U.S. 629.) In reversing the judgment in favor of the school board, *Davis* held a funding recipient could be liable for damages under Title IX for peer sexual harassment when its "response" to known acts of harassment in its programs and activities is one of deliberate indifference, and when the harassment "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." (*Davis, supra*, at p. 633.)

*Davis* also reiterated the teachings of *Gebser* and *Franklin* by refusing to apply agency principles to a claim for money damages under Title IX. Instead, liability can attach only when a grant recipient's *own* misconduct—deliberate indifference to known acts of harassment—"amounts to an intentional violation of Title IX, capable of supporting a private damages action." (*Davis, supra*, 526 U.S. at p. 643.) "Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action." (*Davis, supra*, at p. 644.) Thus, a recipient's damages liability is limited to "circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." (*Id.* at p. 645.) Although the harasser may be an "agent" of the recipient (e.g., a teacher as in *Gebser*), the liability of a recipient is not based on agency, but rather the recipient's *own* deliberate indifference to discrimination. (*Davis, supra*, at pp. 645–646 [noting in *Gebser, supra*, 524 U.S. 274, liability "did not arise because the 'teacher's actions [were] treated' as those of the funding recipient," but rather because the district "was directly liable for its *own* failure to act"].)

The court in *Davis* was careful to note its holding did not mean a recipient of federal funds must "purg[e] [its] school[] of actionable peer harassment or that administrators must engage in particular disciplinary action" in order to avoid liability for intentional discrimination. (*Davis, supra*, 526 U.S. at p. 648.) By invoking the "deliberate indifference to known acts of peer sexual harassment" standard, the court provided school officials with flexibility to respond to harassment without being "second guessed," as long as their response is not "clearly unreasonable" under the circumstances. (*Id.* at pp. 648–649.)

Nor did *Davis* support liability for "simple acts of teasing and name-calling among school children . . . even where these comments target differences in gender." (*Davis, supra*, 526 U.S. at p. 652.) "[S]chools are unlike the adult workplace and . . . children may regularly interact in a manner that would be unacceptable among adults. [Citation.] Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." (*Id.* at pp. 651–652.) Therefore, "in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." (*Davis, supra*, at p. 652.)

■ Although in theory a single act of peer harassment could rise to the level of "severe" and "pervasive" behavior to invoke Title IX protection, the *Davis* court observed Congress likely required behavior severe enough to "have the systemic effect of denying the victim equal access to an educational program or activity" (*Davis, supra,* 526 U.S. at p. 652) in light of the "inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment" (*id.* at p. 653). "By limiting private damages actions to cases having a systemic effect on educational programs or activities, we reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored." (*Ibid.*)

■ Most recently, the court addressed whether Title IX's right of action included a claim for retaliation. (*Jackson v. Birmingham Bd. of Ed.* (2005) 544 U.S. 167 [161 L.Ed.2d 361, 125 S.Ct. 1497].) In *Jackson*, the plaintiff alleged he was retaliated against for complaining that the girls' basketball team he coached was not receiving funding equal to the boys' basketball team. Observing that it consistently construed "discrimination" under Title IX broadly and that "[r]eporting incidents of discrimination is integral to Title IX enforcement . . ." (*Jackson, supra,* at p. 180), the court concluded, "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." (*Id.* at p. 174.)

### 2. *Title IX's Elements Govern a Damage Claim for Peer Sexual Orientation Harassment Under Section 220*

■ Like Title IX, the antidiscrimination provisions in the Education Code are designed primarily to prevent recipients of state funding from using such funds in a discriminatory manner: Both statutes condition their prohibition on discrimination on the receipt of public funding; both broadly proscribe discrimination in education; and both have procedures for administrative enforcement. (See *Gebser, supra,* 524 U.S. at pp. 280–281; 20 U.S.C. § 1682, recited in full, *ante,* in fn. 13; 34 C.F.R. § 106.71 (2008), which refers to 34 C.F.R. §§ 100.6–100.11 (2008), the administrative provisions of tit. VI.) It is for these reasons the United States Supreme Court analogized Title IX to title VI and *not* to Title VII. We too conclude that Education Code section 220 is more analogous to Government Code section 11135 and Title IX than to FEHA, which simply prohibits discrimination in employment outright without tying that condition to public funding.

■ In California, section 221.1 requires the State Board of Education, the governing and policymaking body of the State Department of Education,

to adopt regulations implementing chapter 2 of the Education Code, the antidiscrimination in education provisions. (See Cal. Code Regs., tit. 5, § 4600 et seq.) Among other things, the regulations require a "local agency"[17] to insure compliance with applicable state and federal laws and regulations; to investigate complaints alleging failure to comply with applicable state and federal laws and regulations and/or discrimination; and to seek to resolve those complaints in accordance with the procedures contained both in the regulations and the policies and procedures of the governing board. (Cal. Code Regs., tit. 5, §§ 4610, subd. (c), 4620.) A local agency also must notify students, employees, and parents, among others, of its local educational agency complaint procedures (Cal. Code Regs., tit. 5, § 4622); identify the person or persons responsible for processing complaints (*ibid.*); and "advise the recipient of any civil law remedies that may be available under state or federal discrimination laws, if applicable, and of the appeal pursuant to Education Code section 262.3." (Cal. Code Regs., tit. 5, § 4622.)

A complaint of discrimination must be filed with the local educational agency "not later than six months from the date the alleged discrimination occurred, or the date the complainant first obtained knowledge of the facts of the alleged discrimination." (Cal. Code Regs., tit. 5, § 4630, subd. (b).) With certain exceptions, within 60 days from the date of the receipt of the complaint the local agency shall "conduct and complete an investigation" of the complaint, and prepare a written "[a]gency [d]ecision." (Cal. Code Regs., tit. 5, § 4631, subd. (a).) The agency decision should include (1) findings of fact; (2) conclusions of law; (3) disposition of the complaint; (4) the rationale for such disposition; (5) corrective actions, if warranted; (6) notice of the complainant's right to appeal the local agency's decision to the State Department of Education; and (7) the procedures to be followed to initiate such an appeal. (Cal. Code Regs., tit. 5, § 4631, subd. (e).)

Like enforcement of Title IX, as interpreted by the United States Supreme Court in *Gebser, supra,* 524 U.S. at pages 287–288, enforcement of the Education Code's antidiscrimination law rests on the assumption of "actual notice" to the funding recipient. (See Cal. Code Regs., tit. 5, § 4670, subd. (a)(1) [requiring the State Dept. of Education to notify a funding recipient of a violation and provide the opportunity to take corrective action to comply before public funds may be withheld].)

In contrast, FEHA imposes liability against an employer for the wrongful acts of a third party based on the doctrine of respondeat superior

---

[17] "Local agency" is defined as a "school district governing board or a local public or private agency which receives direct or indirect funding or any other financial assistance from the state to provide any school programs or activities . . . ." (Cal. Code Regs., tit. 5, § 4600, subd. (n).)

and/or constructive notice. (See Gov. Code, § 12926, subd. (d) [as relevant here, "employer" is defined to include, among other things, "any person acting as an *agent* of an employer" (italics added)]; *Yamaguchi v. Harnsmut* (2003) 106 Cal.App.4th 472, 481 [130 Cal.Rptr.2d 706] ["Under the doctrine of respondeat superior, an innocent employer may be liable for the torts its employee commits while acting within the scope of his employment. This liability is based *not on* the employer's fault, but on public policies concerning who should bear the risk of harm created by the employer's enterprise" (italics added)].) The Education Code's antidiscrimination provisions contain no similar reference to agency principles, and we discern nothing in that law or its legislative history suggesting the Legislature intended to impose liability for damages under section 220 against a funding recipient based on principles of respondeat superior and/or constructive notice.

■■■ We decline to adopt a liability standard for damages under section 220 based on principles of respondeat superior and/or constructive notice, particularly in light of the circumstances presented here, when the claim of discrimination is not, for example, based on an official policy of the District, but is instead the result of peer sexual orientation harassment and the District's response (or lack thereof) to such harassment. We agree with *Gebser* and *Davis* that negligence principles should not apply to impose liability under a statutory scheme when administrative enforcement of that scheme contemplates actual notice to the funding recipient, with an opportunity to take corrective action before a private action may lie. By requiring actual notice, we ensure liability for money damages under section 220 is based on a funding recipient's *own* misconduct, determined by its *own* deliberate indifference to known acts of harassment. (See also *Davis, supra*, 526 U.S. at pp. 640–641 [concluding a "recipient of federal funds may be liable in damages under Title IX only for its own misconduct," inasmuch as the "Government's enforcement power may only be exercised against the funding recipient . . . ."].)

We reject plaintiffs' argument that by our adopting Title IX's standards in a section 220 claim for money damages, victims of discrimination are deprived of the protections afforded them under the California Education Code because California law is merely duplicative of existing federal law. Title IX applies only to discrimination based on sex. (20 U.S.C. § 1681(a).) It is unknown whether plaintiffs here could have asserted a claim for peer sexual orientation harassment under Title IX, inasmuch as the United States Supreme Court has yet to decide whether sexual orientation harassment is discrimination based on "sex" within the meaning of that law. (See Mayes, *Confronting Same-Sex, Student-To-Student Sexual Harassment: Recommendations for Educators and Policy Makers* (2001) 29 Fordham Urb. L.J. 641, 642–643; but see *Martin v. Swartz Creek Community Schools* (E.D.Mich. 2006) 419 F.Supp.2d 967 [applying Tit. IX to gay student who sued school district for peer sexual

orientation harassment]; *Schroeder ex rel. Schroeder v. Maumee Bd. of Educ.* (N.D. Ohio 2003) 296 F.Supp.2d 869, 879–880 [repeated harassment of plaintiff based on his perceived sexual orientation was motivated by plaintiff's sex, and thus sufficient to state a claim under Tit. IX]; *Montgomery v. Independent School Dist. No. 709* (D.Minn. 2000) 109 F.Supp.2d 1081, 1090–1091 [students tormenting plaintiff based on perception he was gay states a claim under Tit. IX].)

In addition, it is unknown whether plaintiffs could have brought a Title IX claim against the District in state court, as the United States Supreme Court has yet to decide whether Congress, in the exercise of its powers under the supremacy clause, intended to divest state courts of their concurrent jurisdiction. (See *Williams v. Oak Park City School Dist.* (E.D.Mich. 2007) 2007 WL 1063346, p. *3, fn. 5.) State courts confronted with this issue have held, however, that they have jurisdiction to hear Title IX claims.[18] (See, e.g., *Morrison v. Northern Essex Community College* (2002) 56 Mass.App. 784, 787, fn. 9 [780 N.E.2d 132, 136]; *H.M. v. Jefferson County Bd. of Educ.* (Ala. 1998) 719 So.2d 793, 796.)

█ In contrast, section 220 is substantially broader than Title IX and protects victims from discrimination in education based on disability, gender, nationality, race or ethnicity, religion, and sexual orientation, among other characteristics. (See § 220.) And by our concluding the Legislature intended Title IX's standards of liability to apply to a section 220 claim for *money damages*, a victim of harassment is not deprived of the broad administrative protections and enforcement procedures provided under the Education Code and existing regulations.

█ We also reject plaintiffs' argument that the policy objectives of the antidiscrimination in education law can only be satisfied when the "more aggressive" FEHA standards of liability are applied to a section 220 violation. Students in public schools are entitled to "equal rights and opportunities" in education (§ 200) and to participate fully in the educational process "free from discrimination and harassment." (§ 201, subd. (a).) To effectuate this policy, which is guaranteed by the federal and state Constitutions, the Legislature requires California's public schools to take affirmative steps to "combat racism, sexism, and other forms of bias." (§ 201, subd. (b).) They also must "prevent and respond to acts of hate violence and bias-related incidents" in an "urgent" manner (§ 201, subd. (d)); and they must "teach and inform pupils in the public schools about their rights . . . in order to increase pupils' awareness and understanding of their rights and the rights of others, with the intention of promoting tolerance and sensitivity in public schools

---

[18] Because plaintiffs did not assert a Title IX claim against the District, we do not decide whether a state trial court would have concurrent jurisdiction over such a claim.

and in society as a means of responding to potential harassment and hate violence" (§ 201, subd. (e)).

These policy objectives, at least initially, are best achieved through administrative enforcement, in contrast to a private action for damages. Administrative enforcement is designed to provide a prompt means to address discrimination complaints, which in turn fulfills the Legislature's mandate of the *"urgent* need to prevent and respond to acts of hate violence and bias-related incidents" (§ 201, subd. (d), italics added) and of the *"urgent* need to teach and inform pupils" (§ 201, subd. (e), italics added) of their rights and the rights of others in order to promote "tolerance and sensitivity" in our public schools (*ibid.*). Without administrative enforcement, students victimized by harassment or discrimination would have no recourse other than private suit. But, as is true here, a private enforcement action for *damages* may not be resolved until long after a student has graduated from public school, thus frustrating the Legislature's intent behind the antidiscrimination law of ensuring all pupils the right to participate fully in the educational process. (§ 201, subd. (a).)

Administrative enforcement also has the advantage of efficiency, allowing a funding recipient the opportunity to investigate and resolve complaints of discrimination, either through corrective action of its own or through means other than a private lawsuit. (Cal. Code Regs., tit. 5, § 4631, subds. (f), (g) [parties are authorized to utilize alternative methods to resolve the allegations in the complaint, including, but not limited to, mediation, and the local agency is authorized to resolve a dispute before the "formal filing of a written complaint"].) Such measures, in place of private damage suits, also may help reduce the financial burden of compliance placed on public schools. (See, e.g., *Gebser, supra,* 524 U.S. at p. 289 ["a central purpose of requiring notice of the violation 'to the appropriate person' and an opportunity for voluntary compliance . . . is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures"].)

■ Although it authorized a private right of action for a section 220 violation, we thus conclude the Legislature also sought to accomplish the policy objectives underlying the antidiscrimination in education law through administrative enforcement, to avoid "throwing [public] schools into immediate litigation" (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 499 (1997–1998 Reg. Sess.) as amended July 22, 1998) and to give schools an opportunity to resolve informally as many cases as possible. (See Assemblymember Sheila Kuehl, letter to Governor Pete

Wilson,[19] requesting his signature on Assem. Bill No. 499 (1997–1998 Reg. Sess.) Sept. 2, 1998 [because this bill "help[s] to contain the costs of litigation" and makes "clear that [the] administrative grievance procedures are to be used to resolve as many cases as possible without litigation"].)[20] We thus reject plaintiffs' premise that only by applying the FEHA standards of liability can these policies be fully realized.

### E. *Jury Instructions*

Turning to the facts of this case, we conclude the trial court erred when it instructed the jury using FEHA standards of liability, derived chiefly from Government Code section 12940, subdivision (j)(1), which imposes liability (against an employer) "if the entity, or its agents or supervisors, knows or should have known" of the harassment "and fails to take immediate and appropriate corrective action." We further conclude, however, that the error was harmless "because it is not reasonably probable defendant would have obtained a more favorable result in its absence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570 [34 Cal.Rptr.2d 607, 882 P.2d 298]; see *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163]; see also Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

The jury made specific findings in connection with plaintiffs' equal protection claims against the individual defendants. The jury found that Fisher had "actual notice" of the peer sexual orientation harassment to which plaintiffs were subjected on campus, and that he acted with "deliberate indifference" in response to such known harassment.[21] It also found both plaintiffs experienced harassment that was "so severe, pervasive and offensive to a reasonable person of the same sexual orientation that it effectively deprived" plaintiffs of their equal access to education at PHS. The elements "severe and pervasive"

---

[19] Our task is to ascertain the intent of the Legislature as a whole. (See *Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062 [48 Cal.Rptr.2d 1, 906 P.2d 1057]; *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699–701 [170 Cal.Rptr. 817, 621 P.2d 856].) However, a "legislator's statement is entitled to consideration . . . when it is a reiteration of legislative discussion and events leading to adoption of proposed amendments rather than merely an expression of personal opinion." (*California Teachers Assn. v. San Diego Community College Dist.,* at p. 700; *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1157, fn. 6 [278 Cal.Rptr. 614, 805 P.2d 873].)

[20] The record shows the parties did not avail themselves of these administrative procedures, a point they confirmed at oral argument. The parties also did not raise in this appeal any issue regarding such procedures, exhaustion of administrative remedies and/or administrative enforcement. As we have noted, these administrative procedures provide a means for the parties to resolve promptly and efficiently complaints of prohibited discrimination before resorting to litigation, thus ensuring our state's education resources are not unnecessarily diverted. (See, e.g., §§ 200, 201.)

[21] The jury made the same findings involving Giles, except only as to plaintiff Ramelli.

harassment, "actual notice" and "deliberate indifference," which govern an equal protection claim, are the *same* elements that apply to establish a claim for money damages under Title IX (*Soper ex rel. Soper v. Hoben* (6th Cir. 1999) 195 F.3d 845, 854, citing *Davis, supra,* 526 U.S. at pp. 633–642) and . section 220.

As we have noted, as the PHS principal Fisher was an "appropriate person" to act on behalf of the District to address the peer sexual orientation harassment to which plaintiffs were subjected at PHS. Thus, the jury's findings imposing liability against Fisher, albeit in the context of an equal protection violation, also can support liability against the District under section 220, based on the District's *own* deliberate indifference in its response (through Fisher) to the peer sexual orientation harassment to which plaintiffs were subjected at PHS. As we have also noted, the District's liability under section 220 is based not on principles of respondeat superior and/or constructive notice, but rather on its *own* wrongdoing through its legally inadequate response to the harassment plaintiffs experienced at PHS.

The District anticipated this result, inasmuch as it contends the evidence in the record is insufficient to show that *it* was deliberately indifferent to support a violation of section 220. We reject this contention. We also reject the contention of Fisher and Giles that the evidence does not support the jury's findings they acted with deliberate indifference for purposes of plaintiffs' equal protection claims.

1. *Substantial Evidence Supports the Jury's Findings of "Deliberate Indifference"*

The court gave the following instruction regarding the meaning of deliberate indifference: "[This term] means that the defendant's response to the alleged harassment or lack of response was clearly unreasonable in light of all the known circumstances. A response by the Defendant that is merely inept, erroneous, ineffective, or negligent does not amount to deliberate indifference. However, an official cannot simply turn a blind eye and do nothing and must respond in a prompt, timely and reasonable manner to a Plaintiff's allegations of discrimination. [¶] For deliberate indifference to occur where one student harasses another student, the harassment must take place in a context subject to the individual Defendant's control, and the individual Defendants must have disciplinary authority over the person who is harassing the Plaintiff."

Neither party objected to this definition of "deliberate indifference," which, in any event, generally tracks federal Title IX law.[22] (See *Davis, supra,* 526 U.S. at pp. 633, 640–649; *Kinman v. Omaha Public School Dist.* (8th Cir. 1999) 171 F.3d 607, 610; *Doe v. Dallas Independent School Dist.* (5th Cir. 1998) 153 F.3d 211, 219.) The parties also do not dispute the harassment suffered by plaintiffs took place in an environment subject to the District's control or that Fisher and Giles had disciplinary authority over PHS students harassing plaintiffs.

Defendants instead argue that, as a matter of law, the jury's deliberate indifference findings cannot survive on appeal because the response, or lack thereof, of Fisher, as it relates to peer sexual orientation harassment suffered by plaintiffs, and of Giles, as it relates to such harassment suffered by Ramelli only, was not "clearly unreasonable in light of the known circumstances." (*Davis, supra,* 526 U.S. at pp. 648–649.) As a fallback, defendants argue there is insufficient evidence in the record to support the jury's findings of deliberate indifference.[23]

 The decisions of federal courts interpreting Title IX provide a meaningful starting point to determine whether the response of defendants here amounted to deliberate indifference under section 220. Under federal law, deliberate indifference is a " 'very high standard.' " (*Baynard v. Malone* (4th Cir. 2001) 268 F.3d 228, 236; see *Grayson v. Peed* (4th Cir. 1999) 195 F.3d 692, 695, cert. denied 529 U.S. 1067 [146 L.Ed.2d 482, 120 S.Ct. 1673].) Actions that in hindsight are "unfortunate" or even "imprudent" will not suffice. (*Jones v. Wellham* (4th Cir. 1997) 104 F.3d 620, 627.) The deliberate indifference standard ensures that the disciplinary actions of school officials will not be second-guessed by the courts. (*Davis, supra,* 526 U.S. at p. 648.)

The failure of school officials to undertake a timely investigation of a complaint of discrimination under Title IX may amount to deliberate indifference. (See, e.g., *Davis v. DeKalb County School Dist.* (11th Cir. 2000) 233 F.3d 1367, 1373–1374.) School officials also must take timely and

---

[22] Fisher and Giles objected to a portion of the equal protection jury instruction as it pertained to the individual defendants' "failure to train," which was based on *Flores v. Morgan Hill Unified School Dist.* (9th Cir. 2003) 324 F.3d 1130. However, in light of our conclusion, *post,* that there is substantial evidence in the record to support the jury's findings of deliberate indifference without regard to this theory of liability, we conclude the instructional error, if any, was harmless.

[23] The defendants do not dispute that plaintiffs were subject to "severe, pervasive and offensive" antigay harassment under section 220, a position they confirmed at oral argument. Defendants also do not dispute they had "actual knowledge" of such antigay peer harassment experienced by plaintiffs. Instead, they contend on appeal their response to such harassment was legally sufficient.

reasonable measures to end the known harassment. (*Wills v. Brown University* (1st Cir. 1999) 184 F.3d 20, 26.) A response may be clearly unreasonable if a school official ignores a complaint of discrimination (*Murrell v. School Dist. No. 1, Denver, CO* (10th Cir. 1999) 186 F.3d 1238, 1247–1248) or if the initial measures chosen to respond to the harassment are ineffective. (*Vance v. Spencer County Public School Dist.* (6th Cir. 2000) 231 F.3d 253, 262 [school district found to be deliberately indifferent to peer sexual harassment because it used "same ineffective methods to no acknowledged avail"]; *Wills v. Brown University, supra,* 184 F.3d at p. 26 ["If the institution takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment," but "if it learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability"]; *Martin v. Swartz Creek Community Schools, supra,* 419 F.Supp.2d at p. 974 ["The admitted fact that Plaintiff continued to make complaints of harassment every single month, and that the school district's efforts to discuss these events or otherwise punish individual student harassers did not abate the frequency or severity of such incidents, might alone create a jury question of whether the school was deliberately indifferent (i.e., that it was required to take other types of action to eliminate the behavior in light of those circumstances)."]; *Jones v. Indiana Area School Dist.* (W.D.Pa. 2005) 397 F.Supp.2d 628, 645–646 [summary judgment denied where the district continued simply " 'talking to' " the perpetrating student long after it became apparent that such action was ineffective]; *Theno v. Tonganoxie Unified School Dist No. 464* (D.Kan. 2005) 377 F.Supp.2d 952, 966 [sufficient evidence to support denial of summary judgment where plaintiff was subject to "severe and pervasive harassment that lasted for years, with other students engaging in the same form of harassment after those who were counseled had stopped, and the school rarely took any disciplinary measures above and beyond merely talking to and warning the harassers," and when school district began taking more aggressive measures, "[b]y that time, the harassment had been going on for a number of years without the school handing out any meaningful disciplinary measures to deter other students from perpetuating the cycle of harassment"]; *Canty v. Old Rochester Regional School Dist.* (D.Mass. 1999) 66 F.Supp.2d 114, 117 [summary judgment denied when measures taken by school district to end harassment of student by a teacher were ineffective, requiring school district to take further steps to protect student to avoid liability].)

"[D]eliberate indifference will often be a fact-based question, for which bright line rules are ill-suited." (*Doe ex rel. Doe v. Derby Bd. of Educ.* (D.Conn. 2006) 451 F.Supp.2d 438, 447.) We apply the substantial evidence standard of review here, inasmuch as the record contains sufficient evidence for a jury to infer defendants were deliberately indifferent to the known peer sexual orientation harassment that plaintiffs were subject to at PHS. In so

doing, our role is not to reweigh the evidence, but only to determine whether the record as a whole contains substantial evidence to support the findings of deliberate indifference. When a "factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Bowers, supra,* 150 Cal.App.3d at pp. 873–874, italics omitted.) "If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Id.* at p. 874, italics omitted.)

While the testimony of a single witness may be sufficient substantial evidence (*City and County of San Francisco v. Givens* (2000) 85 Cal.App.4th 51, 56 [101 Cal.Rptr.2d 859]), such evidence " 'must be of ponderable legal significance,' " " 'credible,' " and of " 'solid value' " (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191]). We view the record in the light most favorable to plaintiffs and resolve all evidentiary conflicts and indulge all reasonable inferences in support of the judgment. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].) If the record contains substantial evidence in support of the judgment, we must affirm even if there is substantial contrary evidence. (*Bowers, supra,* 150 Cal.App.3d at p. 874.) Here, we conclude substantial evidence exists in the record to support the jury's findings of deliberate indifference by defendants.

### 2. *Facts Common to Ramelli and Donovan*

a. The District had a written policy prohibiting sexual orientation harassment.

b. Principal Fisher and assistant principal Giles were officials with authority to take action on behalf of the District. Superintendent Phillips testified that assistant principals are typically the individuals charged with investigating complaints by students and that it is District policy to resolve a student complaint "as early as possible and at the lowest level in terms of the organizational structure."

c. As principal of PHS, Fisher had the "broadest" duties of all administrators at the school, and his highest priority was student safety. Fisher testified that a student should not be harassed at school by anyone, that it was unacceptable for a student to be called a "fag" even once, and that the term "fag" or similar epithets should not be used in a "casual" sense.

d. In 2002–2003 Giles was responsible for discipline at PHS. However, because the issue of discipline in a school the size of PHS can be "overwhelming," Giles shared that responsibility with three other assistant principals, who categorized discipline responsibility into "inside" and "outside" discipline. Inside discipline meant anything that happens inside the classroom, such as classroom disruptions, academic dishonesty, tardies and absences, and truancies. Outside discipline referred to events taking place outside the classroom, such as during "passing periods," lunch, or break time. Giles was responsible for outside discipline on Mondays, Wednesdays and Fridays.

e. Giles's normal procedure for investigating any incident on campus was to have a student prepare a written statement. He then met with the student and obtained as much information as possible regarding the incident or event. According to Giles, the filing of a written complaint by a student triggers the uniform complaint procedures used by the District.

f. In the beginning of the school year, including all years relevant here, Fisher and his team of administrators visit each classroom at PHS and spend between 30 and 45 minutes reviewing the PHS Code of Conduct with students and discussing with them what behavior is and is not acceptable. Administrators also cover the prohibition on students' use of derogatory language, such as "that's so gay." Tom Pack, the athletic director and an assistant principal of PHS, confirmed he spoke with students about their use of derogatory words and inappropriate language during the 2002 and 2003 timeframe. He testified the use of such language is an ongoing problem in schools today.

g. As principal of approximately 3,000 students, Fisher typically does not review student complaints. Instead, if a problem existed on campus Fisher usually heard about it from Traci Barker-Ball, the coordinator of student services. According to Fisher, Barker-Ball was not shy about making a point and, if she believed an issue required his attention, she would inform him. Barker-Ball confirmed this testimony, noting it was her habit to keep Fisher and his administration informed of issues affecting students, which typically involved drugs, fights, threats of suicide, and harassment, including against gay and lesbian students.

h. Beginning in early 2003, Ramelli and Donovan each began to keep a log detailing incidents of sexual orientation harassment they witnessed and/or were subjected to at PHS. The students, along with their mothers, met with Fisher on March 27, 2003, and gave him their logs and a written complaint outlining their right to an education free from harassment and discrimination.

i. Ramelli and Donovan each testified that Fisher promised to investigate the incidents in their logs, but that neither Fisher nor any other PHS administrator, including Giles, followed up with them to discuss their logs or written complaint or any incidents described in their logs, or to seek additional information in furtherance of any investigation. Fisher admitted that other than at the March 27, 2003 meeting, he never met with either Ramelli or Donovan, or with the students' mothers, and never attempted to schedule a followup meeting to address the concerns they had raised at that meeting.

j. After their March 27, 2003 meeting with Fisher, both Ramelli and Donovan testified that for the remainder of their junior year, they continued to be subjected to antigay harassment by their peers.

k. During the 2002–2003 school year, Barker-Ball prepared a "harassment packet" to distribute to PHS faculty specifically dealing with gay and lesbian issues. Barker-Ball became aware of the need for this information during faculty training she had conducted in the fall of 2002, when she had learned the faculty was unsure how to respond to students' use of antigay language in their classrooms. Assistant principal Lyn Antrim also worked on this project with Barker-Ball. However, Antrim wanted the packet to cover other types of harassment, including racial and sexual harassment. Although Barker-Ball completed the harassment packet, it was never distributed.

l. Student Joseph S. attended PHS at the same time as Ramelli and Donovan and was also subject to peer sexual orientation harassment at PHS. Joseph S. and his mother continually reported this harassment to Fisher, his administrative staff, and Barker-Ball. The harassment included name calling, being spit on, having rocks and food thrown at him, being pushed into the lockers, and being badly beaten by another PHS student because Joseph S. was gay. Despite numerous complaints by Joseph S. and his mother, the peer harassment he endured at PHS continued unabated until he enrolled in the District's New Directions program.[24]

---

[24] The District briefly argues the trial court erred in admitting the peer sexual orientation harassment experienced by PHS student Joseph S. during the 2001–2002 school year. The District claims such evidence would have been inadmissible if the trial court had properly instructed the jury that actual, and not constructive, knowledge was required to establish a claim under section 220. However, the trial court did not abuse its discretion in admitting such evidence. (See *Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1157 [46 Cal.Rptr.3d 780].) This evidence shows that Joseph S. experienced peer sexual orientation harassment at PHS at the same time plaintiffs also were being harassed at PHS because of their sexual orientation, and that Joseph S. discussed such harassment during Gay-Straight Alliance meetings attended by Ramelli and Barker-Ball. In addition, Ramelli witnessed Joseph S. being badly beaten at school, presumably because Joseph S. was gay. Thus, the admission of such evidence was not limited to the issue of whether the District had constructive knowledge of the peer sexual orientation harassment plaintiffs experienced at PHS. Moreover, even if it was error for the

### 3. *Facts Concerning Ramelli*

Each semester Ramelli attended PHS, he experienced peer antigay harassment when on campus. That harassment became more severe and the number of incidents of harassment increased each year. Ramelli complained to Barker-Ball about the antigay harassment and how it was increasingly being directed at him—that he was "being picked up on the radar, so to speak," because he was gay. In response, Barker-Ball advised him to "brush it off" and be the "bigger man," since these were "just high school kids."

Fisher admitted Ramelli made several written complaints to the school about the antigay harassment he was subjected to by his peers. Fisher also admitted that with respect to some of these complaints, there was no followup by him or his administration, including an incident during Ramelli's junior year that occurred after school on the Day of Silence, when a car pulled up alongside Ramelli's car after he, Donovan, and their friends had just left school, and the occupants screamed, "You fucking faggots, fuck you guys, fucking queers."

Giles testified he did not know when the discipline office received Ramelli's written complaint about the car incident and confirmed he undertook no investigation and only learned about it through this lawsuit. Giles also was unaware of a written complaint made by Ramelli on April 21, 2003, when he was spit on while on campus, until he went through Ramelli's file in connection with this lawsuit.

These facts support the jury's findings Fisher and Giles each acted with deliberate indifference to the peer sexual orientation harassment Ramelli experienced while a student at PHS. With respect to Fisher, the evidence shows Barker-Ball, and thus Fisher through his express reliance on her, knew as early as 2001, when Ramelli was a freshman, that he was being harassed by his peers because he was gay. The evidence also shows that as time went on the antigay harassment became worse and escalated from name calling into physical violence, death threats, and vandalism to personal property, among other things, supporting the inference that corrective measures, if any, undertaken by Fisher in response to that harassment were ineffective. At a minimum, the jury was entitled to hear this evidence and decide whether Fisher acted with deliberate indifference.

Indeed, this is not a case where the harassment was limited to a few isolated incidents of name calling or is otherwise attributable to mere "banter,

trial court to have admitted such evidence, there was no prejudice here because as discussed *post*, there is sufficient additional evidence in the record to support liability against the District for its violation of section 220. (See *People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639–640 [92 Cal.Rptr.2d 115].)

teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." (*Davis, supra*, 526 U.S. at pp. 651–652.) The evidence here instead shows Ramelli endured severe and pervasive peer sexual orientation harassment for at least two years (during his sophomore and junior years) while Fisher was principal at PHS.

As principal, Fisher admitted he had broad duties to protect PHS students and to enforce the rules regulating standards of student behavior, including the rule against sexual orientation discrimination. The evidence supports the inference Fisher did little, if anything, to curb the antigay environment at PHS, which also was evident through the testimony of Donovan, Joseph S., and other former PHS students, where "students appeared to have felt at ease making inappropriate comments . . . openly in front of teachers and other students, even during classes." (*Theno v. Tonganoxie Unified School Dist. No. 464* (D.Kan. 2005) 394 F.Supp.2d 1299, 1311 [court affirmed jury verdict for plaintiff based on evidence that a "significant number of school administrators essentially turned a blind eye to the harassment by ignoring, tolerating, or trivializing the harassment"].) We conclude the jury could reasonably infer from this record that any corrective measures instituted by Fisher and his staff, including Giles, in response to the peer sexual orientation harassment Ramelli endured while a student at PHS, at some point became ineffective and thus were clearly unreasonable in light of the known circumstances.[25]

Defendants argue Ramelli's generalized complaints about name calling and the use of inappropriate language on campus, being spit on, shoved into the lockers, having food thrown at him, having signs put on his back, and having his car vandalized, among other incidents, prevented the jury from finding their response was clearly unreasonable under the circumstances, inasmuch as their "hands were tied by the *lack* of information provided by Ramelli concerning the harassment he allegedly experienced." However, the jury also heard evidence defendants failed to conduct their own independent investigation into many of these incidents of harassment, which tended to repeat themselves. Such evidence supports a finding of deliberate indifference. (See, e.g., *Flores v. Morgan Hill Unified School Dist., supra*, 324 F.3d at p. 1135 [summary judgment denied where evidence showed school district and school officials did not adequately investigate reported incidents of peer sexual orientation harassment, which supported a finding of deliberate indifference for equal protection violation under 42 U.S.C. § 1983].)

---

[25] As we have already noted, defendants have not argued they lacked "actual knowledge" of the sexual orientation harassment plaintiffs were subjected to by their peers while attending PHS. They likewise have not argued plaintiffs did not experience "severe, pervasive and offensive" peer sexual orientation harassment.

Moreover, the jury could reasonably conclude from the evidence that defendants' response to this harassment was to recommend measures that had already proved ineffective, including having Ramelli report the harassment directly to Giles in the discipline office and work with school counselors to arrange a schedule to minimize his interaction with the general school population during lunch, passing periods, and breaks. On this record, we cannot say the jury's finding that Fisher, and thus the District, acted with deliberate indifference to the peer sexual orientation harassment Ramelli experienced as a PHS student is unsupported by the evidence.

With respect to Giles, the record also includes sufficient evidence to support the jury's finding he acted with deliberate indifference towards Ramelli. The evidence shows during the 2002–2003 school year Giles was responsible for outside discipline on Mondays, Wednesdays, and Fridays, and for issues affecting school climate generally. Giles testified his normal procedure for investigating a student complaint was to have a student prepare a written statement and then meet with that student to discuss the complaint and to obtain additional information.

The evidence shows during the first semester of his junior year, Ramelli told Giles that he witnessed or was subjected to antigay language on campus every day, but Giles did nothing in response other than to tell Ramelli that such language was against the rules. Giles did not seek to obtain additional information regarding this complaint, as was his standard procedure.

During the second semester of his junior year, Ramelli again reported to Giles that "almost every single day" he was subjected to antigay language by his peers. Also during the second semester, Ramelli reported to Barker-Ball, who in turn reported to Giles, that he had water thrown on his backside to make it look like he had urinated on himself. Ramelli also gave Giles written reports regarding a spitting incident that occurred on the Day of Silence, the car incident that took place that same day, and another spitting incident that occurred on April 21, 2003. The evidence shows Giles did not follow his normal procedure of meeting with a student in response to these written complaints, nor did he conduct his own independent investigation.

For example, with respect to the car incident, Giles testified he only learned about Ramelli's written complaint through this lawsuit. Giles agreed, however, he could have used the partial license plate information provided in the written complaint and run it through the student database to determine whether the car belonged to a PHS student. He further agreed he also could have asked campus supervisors, who function as security, to keep an eye out for the car Ramelli identified as a white Mustang when they patrolled the school parking lots, in an effort to identify those responsible for that incident of antigay harassment.

Moreover, Ramelli's mother testified she spoke to Giles about Fisher's suggestion that her son report any harassment directly to Giles as quickly as possible after it occurs. Ramelli's mother said Giles in response told her and her son that Ramelli needed to "quit interrupting him with all of these incidents . . . ."[26]

We conclude the record supports the jury's finding Giles's response to the peer sexual orientation harassment Ramelli was subjected to at PHS was clearly unreasonable in light of all the known circumstances. The evidence supports the inference Giles did not follow his normal practice of meeting with a student after receiving a written complaint in response to the complaints filed by Ramelli in his junior year. It further shows Giles did not undertake any investigation regarding several incidents reported by Ramelli and also did not take timely and reasonable measures to end the known harassment. (*Wills v. Brown University, supra,* 184 F.3d at p. 26.) On this record, we conclude substantial evidence supports the jury's finding Giles acted with deliberate indifference toward Ramelli and the harassment to which he was subjected on campus.

### 4. *Facts Concerning Donovan*

Unlike Ramelli, Donovan was not directly harassed based on her sexual orientation during her freshman year at PHS. However, she testified PHS students used antigay language, such as "fag," "faggot," "dyke," "queer," "homo," "fudge packer," "sissy" and "pansy," among other slurs, every day in the halls and in the classrooms of the campus. Students also used the phrase "that's so gay" as a pejorative "all the time." Donovan struggled internally when she heard such language, even though initially it was not targeted at her, because she was coming to the realization she was a lesbian and it made her feel like a "bad person." During some of her classes Donovan heard students address each other using the term "faggots" or similar epithets about every five minutes. Donovan initially confronted students using antigay language and told them it was offensive to her. This strategy was suggested to her by Barker-Ball, who also recommended Donovan ignore students using such language.

During her sophomore year, Donovan testified, she was subject to name calling and threats of physical violence based on her sexual orientation. Despite reporting this harassment to school administration, it continued, which discouraged her from continuing to make such reports.

---

[26] Giles denied making this statement. However, under the substantial evidence standard of review, our role is not to reweigh this evidence, even when there is a conflict in the record; rather, we are required to view the record in the light most favorable to plaintiffs and resolve all evidentiary conflicts and indulge all reasonable inferences in support of the judgment. (*Nally v. Grace Community Church, supra,* 47 Cal.3d at p. 291.)

During her junior year, Donovan heard PHS students use antigay language inside and outside the classroom "every day." About once a week, this language was specifically directed at her. Donovan also was subjected to threats of physical violence about once a week based on her sexual orientation.

In connection with Donovan's log, Fisher confirmed he did not speak to a student Donovan had identified in a log entry, nor did he speak to the auto class, woodshop, and English teachers about students' use of antigay language in front of Donovan or about other incidents listed by Donovan in her log. He also testified he did not follow up regarding an incident where Donovan and her girlfriend were called "dykes" when they were holding hands and walking on campus. He admitted, however, he had the resources available to him to undertake such an investigation.

Donovan also testified about the incident involving the white Mustang and how it made her "very sad and upset inside" because of the lack of respect from her fellow students. Despite Ramelli's written complaint, which identified Donovan, among others, as witnesses, nobody from PHS interviewed her about this incident or sought to inform her of any action taken as a result of its occurrence.

Based on this evidence, we conclude the record contains sufficient evidence to support the jury's finding that Fisher, and thus the District, acted with deliberate indifference to the known antigay harassment to which Donovan was subjected by her peers. The evidence shows Donovan was subjected to severe and pervasive antigay harassment toward the end of her sophomore year and throughout her junior year at PHS. This evidence also supports the jury's finding that Fisher's response to that harassment was clearly unreasonable under the circumstances. Although Fisher and his staff took steps to investigate Donovan's complaints of harassment after she was not selected for the girls' varsity softball team, the evidence supports the finding he was deliberately indifferent to the ongoing antigay peer harassment Donovan was subjected to while a student at PHS. (See *Riccio v. New Haven Bd. of Educ.* (D.Conn. 2006) 467 F.Supp.2d 219, 227 [concluding a jury could reasonably find that name calling based on sexual orientation or perceived sexual orientation that continued through the school year could signify a systemic problem within the school district and evidence of widespread discrimination].)

### 5. *Other Instructional Error*

Briefly, the District argues the trial court erred when it used the exact language in section 201, subdivision (b)—part of the declarations and intent

section of the antidiscrimination in education law—and instructed the jury that the District had an "affirmative obligation to combat racism, sexism and other forms of bias and a responsibility to provide equal educational opportunity."

We reject this contention. The District cites no authority suggesting that a jury instruction based on the *exact* language of a statute constitutes error, when, as here, that statute expresses the Legislature's declarations and intent of the applicable law. Moreover, as discussed *ante*, because the record contains sufficient evidence to support the finding that the District was deliberately indifferent to the known peer sexual orientation harassment plaintiffs were subjected to at PHS, on this record it is not "reasonably probable that a result more favorable" to the District would have been reached in the absence of any such alleged error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see also Cal. Const., art. VI, § 13 [reversal of judgment only if the error results in a "miscarriage of justice"].)

## II. *NEW TRIAL MOTION*

### A. *Standing to Challenge Denial of New Trial Motion*

Defendants argue the trial court erred in denying their new trial motion under Code of Civil Procedure section 657, subdivision 2, based on juror misconduct.[27] Before reaching the merits of this issue, we note that only the District filed a notice of intention to move for a new trial. Moreover, in the notice of motion in connection with the motion for new trial, only the District was identified as the party moving for such relief.

 When only one of several defendants serves a notice of intention to move for a new trial, a court lacks jurisdiction to grant a new trial as to any other defendants. (See Code Civ. Proc. §§ 657 [provisions allow relief to be granted only "on the application of the party aggrieved"], 659 ["The party intending to move for a new trial must file with the clerk and serve upon each adverse party a notice of his intention to move for a new trial . . . ."]; *Healy Tibbitts Constr. Co. v. Employers' Surplus Lines Ins. Co.* (1977) 72 Cal.App.3d 741, 754 [140 Cal.Rptr. 375] [concluding the court has no power

---

[27] Code of Civil Procedure section 657 provides in part: "The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: [¶] . . . [¶] 2. Misconduct of the jury; and whenever any one or more of the jurors have been induced to assent to any general or special verdict, or to a finding on any question submitted to them by the court, by a resort to the determination of chance, such misconduct may be proved by the affidavit of any one of the jurors."

to grant sua sponte a new trial motion and concluding "where only one of several defendants serves a notice, the court lacks jurisdiction to grant a new trial as to the others . . ."]; 8 Witkin, Cal. Procedure (4th ed. 1997) Attack on Judgment in Trial Court, § 47, p. 553.) We conclude only the District has standing to assert error in connection with the new trial motion, inasmuch as neither Fisher nor Giles filed a notice of intention to move for a new trial as required under the Code of Civil Procedure.

### B. *Background*

Here, the District claims juror Carren Lindsay-Dial engaged in misconduct under Code of Civil Procedure section 657 when she failed to disclose during voir dire an alleged preexisting bias or prejudice against the District.[28] In support of its motion, the District submitted declarations from a secretary of defendants' counsel's law firm, Jennifer McKee, and from juror Bernadette Bauer.

McKee declared that on the day the jury reached its verdict in this case, while riding home from work on the bus she overheard a conversation between the bus driver, Lindsay-Dial, and another passenger, in which Lindsay-Dial allegedly stated she had concerns about the safety of students at PHS and that her son had not felt safe at PHS after "9/11."

Juror Bauer declared Lindsay-Dial "set the tone" during deliberations and had said the "real issue" at PHS involved problems with "white supremacist groups and gangs." Bauer further declared that Lindsay-Dial had a "very strong agenda" during deliberations, that her "attitude was very against the school district," that she stated an adverse judgment against the individual defendants would only cause them to get a note in their file, and that the superintendent should be held individually responsible.

Plaintiffs opposed the new trial motion by relying on the declarations of jurors Paul Burrows and Nathan Bruner (the latter the jury foreman), and a responsive declaration from Lindsay-Dial. Burrows declared he had read the declaration of Bauer and that his perspective of what happened in the jury room was "quite different" from Bauer's. He stated at no time did he perceive any juror to have acted with an agenda, except to weigh the facts and the evidence of this case. He also testified no one person dominated the discussion in the jury room, and during the course of deliberations the jury "would go around the table and discuss the reasoning for our particular votes on particular issues."

---

[28] The District cited other grounds of jury misconduct in its motion for new trial, which it has abandoned on appeal.

With respect to juror Bauer, Burrows said he was frustrated by her inability to explain how she felt and that she did not want to vote in favor of plaintiffs on particular questions because Fisher "was a nice guy" and she did not want him to lose his job. In response, Burrows and other jurors told Bauer they could not consider whether the individual defendants would lose their jobs based on the verdict, but instead were required to answer the questions on the verdict form based on the evidence presented.

Burrows recalled a juror briefly mentioning White supremacy, but he did not recall who made the comment, and in any event he declared that statement "was snuffed quickly as a number of people stated that the jury was not there to consider those issues." Burrows also could not recall Lindsay-Dial's arguing for the jury to hold superintendent Phillips individually liable, although Burrows himself fought to find Phillips liable.

Bruner declared he did not notice during deliberations any member of the jury act with a particular bias for or against any of the parties and that instead the jury "had a lot of good discussions on the issues as we moved through the questionnaire." Specifically, he did not notice any bias against defendants by Lindsay-Dial, and she did not "appear inappropriately rigid during the course of deliberations." He further declared he saw no evidence of any "hidden opinions" held by Lindsay-Dial regarding the District, PHS, or the individual defendants.

Lindsay-Dial in her declaration denied hiding "any feelings or agenda from anybody during the voir dire process." She also declared there was "some mention . . . that there had been a white supremacy issue at [PHS] but it was not brought up in deliberations. Again, that was an entirely separate matter and had nothing to do with the issues here. Those issues did not cause me to lose my ability to be fair and impartial at any time and certainly, at the outset of the case, I did not believe it would impact my fairness and impartiality. I believe that I answered all questions placed to me during the voir dire process honestly. There is nothing about my sons' attendance at [PHS] that would cause me or did cause me to be prejudiced, either in favor of or against either of the parties in this case."

Lindsay-Dial added that when she started this case, she had "no idea what would happen or how I would view the facts to be presented. Even when we went into deliberations, I still had not made any decisions about liability. In

fact, in my observation, when the deliberations started, no one was really in any particular 'camp.' Rather we started from scratch and no one seemed to have any particular agenda in mind. We just started working through each of the questions one by one."

Regarding her son's not feeling safe at PHS, Lindsay-Dial declared she may have said that "at some point after the deliberations," but she added the reason he did not feel safe was because of the "shooting incident at Santana High School [that] had nothing to do with this case and did not impact my ability to be fair and impartial to any of the parties in this case."

As to whether the individual defendants would lose their jobs if found liable, Lindsay-Dial testified another juror raised that issue during deliberations, but she responded that the "corporate world was different from the school world, and [the individual defendants] would probably not lose their jobs over this." Lindsay-Dial also testified this issue did not influence her decisionmaking process as she answered each of the questions on the jury verdict form and that, while she too had sympathy for the PHS administrators, "that sympathy was irrelevant as we had to decide the case based on the facts and evidence presented during the trial."

At the hearing on the new trial motion, the court stated it had "spent quite a bit of time reading declarations, parsing them, and seeking to exclude or seeking to consider evidence consistent with . . . Evidence Code section 1150 on the issue of alleged misconduct." Based on the "totality of the circumstances," the court ruled, "the record does not disclose the existence of jury misconduct. The record does not disclose facts or circumstances which reveal to the Court any conduct which would indicate the absence of fundamental fairness in the process nor, on an individual basis, that there [were] any intentional misstatements or concealments at the time of voir dire in this matter."

The court noted Lindsay-Dial had volunteered information during voir dire, including that both her sons had attended PHS and that one had graduated in 2000 and the other in 2003. Lindsay-Dial also informed the court she did not recognize the names of the principal and vice-principal of PHS, although she did recognize the name of at least one teacher witness. In response to other questions posed during voir dire, Lindsay-Dial volunteered that she taught sixth grade English at Pacific Beach Middle School in the San Diego Unified School District, that she had friends who were gay and lesbian, and that she lived in Poway. At the conclusion of each disclosure Lindsay-Dial informed the court—in response to its questions—that she could be fair and impartial to both sides.

In light of such facts, the court noted the "responses given by [Lindsay-Dial], who is a professional teacher herself and mother of two students who had attended Poway High, did not indicate false responses, inaccurate responses or misleading responses. There were no questions propounded to her to which she provided false or untruthful responses. There is no information that indicates that there was any concealment of information responsive either directly or indirectly to voir dire. Suffice it to say, she was asked whether she felt, given her experience, she could be fair and impartial to both sides, and her response was yes. [¶] She volunteered information concerning the fact that her kids had gone to school there. The parties were provided a thorough opportunity to follow up on the Court's questioning as to whether or not there might have been other problems associated with the kids or what their experience was, but none of those matters are of record in this case because no follow-up was made."

In connection with the Bauer declaration that Lindsay-Dial set the "tone" for the jury deliberations, the court noted this "is just the type of information which is inappropriate for the Court to consider on a Motion for New Trial," and that, in any event, there was no "information in the record or otherwise that would suggest that the jury had any substantial disputes between them or otherwise any juror acted in a manner that was other than appropriate for jurors to act, given their respective assignments and the instructions of the Court. [¶] An alleged comment, whether given or not, about an unrelated problem of gangs and white supremacists also invades the deliberative processes of the jury." The court therefore denied the new trial motion, ruling the "declarations of [the District] are insufficient to raise the issue of misconduct, that there was no jury misconduct in this case and that the process in this matter is not one that would indicate an absence of fundamental fairness or the existence of false, inaccurate, misleading or concealment-type issues."

## C. Analysis

An order denying a new trial is appealable as a postjudgment order under Code of Civil Procedure section 904.1, subdivision (a)(2). "In determining whether juror misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*People v. Schmeck* (2005) 37 Cal.4th 240, 294 [33 Cal.Rptr.3d 397, 118 P.3d 451] [concluding trial court's finding that juror did not engage in misconduct was supported by substantial evidence, despite conflicting evidence whether juror engaged in inappropriate conversations

with third parties]; see also *People v. Pride* (1992) 3 Cal.4th 195, 260 [10 Cal.Rptr.2d 636, 833 P.2d 643] ["we defer to the court's observations and credibility determinations" regarding whether misconduct occurred].)

The moving party bears the burden of establishing juror misconduct. (See Code Civ. Proc., § 657, subd. 2; *People v. Duran* (1996) 50 Cal.App.4th 103, 113 [57 Cal.Rptr.2d 635].) " 'A juror who conceals relevant facts or gives false answers during the voir dire examination . . . undermines the jury selection process and commits misconduct. [Citations.]' " (*In re Hamilton* (1999) 20 Cal.4th 273, 295 [84 Cal.Rptr.2d 403, 975 P.2d 600]; *Wiley v. Southern Pacific Transportation Co.* (1990) 220 Cal.App.3d 177, 189 [269 Cal.Rptr. 240] ["concealment of relevant facts or giving false answers during the voir dire examination constitutes misconduct . . ."].) Whether a juror engages in misconduct is determined based on evidence of "any overt event or circumstance, 'open to [corroboration by] sight, hearing, and the other senses' [citation], which suggests a likelihood that one or more members of the jury were influenced by improper bias." (*In re Hamilton, supra*, at p. 294, italics & fn. omitted; see *People v. Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132].)

However, "with narrow exceptions, evidence that the internal thought processes of one or more jurors were biased is not admissible to impeach a verdict. The jury's impartiality may be challenged by evidence of 'statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly,' but '[n]o evidence is admissible to show the [actual] effect of such statement, conduct, condition, or event upon a juror . . . or concerning the mental processes by which [the verdict] was determined.' " (*In re Hamilton, supra*, 20 Cal.4th at p. 294, italics omitted, quoting Evid. Code, § 1150, subd. (a).)

The record here shows the trial court carefully considered the witness declarations filed in support of and against the new trial motion and ruled Lindsay-Dial did not conceal or provide false or misleading information during voir dire. We conclude substantial evidence supports the court's finding and further supports the finding that the District did not avail itself of the opportunity to question Lindsay-Dial regarding any information she disclosed or to conduct followup questioning of her, despite having ample opportunity to do so.

We further conclude there is overwhelming evidence in the record to support the trial court's determination that Lindsay-Dial was vigilant in disclosing information during voir dire, in contrast to the incidents of jury misconduct in *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98

[95 Cal.Rptr. 516, 485 P.2d 1132] and *Wiley v. Southern Pacific Transportation Co., supra,* 220 Cal.App.3d at pages 188–190, on which the District relies. The evidence here shows she raised her hand several times in response to questions posed by the court, where she admitted her two sons had graduated from PHS in 2000 and 2003; she knew the name of one potential witness, Tom Pack; she herself was a teacher in the San Diego Unified School District; she had friends who were gay and lesbian; she and her husband lived in Poway; and she could be fair and impartial to both sides. On this record, substantial evidence supports the trial court's determination there was no juror misconduct under Code of Civil Procedure section 657.

We also conclude there is no prejudice here, even if we assume all evidence proffered by the District was admissible under the Evidence Code, including under Evidence Code section 1150, and even if we assume the District satisfied its burden to establish jury misconduct in the first instance. A juror's misconduct raises a presumption of prejudice, which is reviewed as a mixed question of law and fact. (*In re Hamilton, supra,* 20 Cal.4th at p. 295; *People v. Nesler* (1997) 16 Cal.4th 561, 582–583 [66 Cal.Rptr.2d 454, 941 P.2d 87].) In making this assessment, we defer to the trial court's findings if supported by substantial evidence, and "independently determine whether, from the nature of [the juror] misconduct and all the surrounding circumstances, there is a substantial likelihood" that the misconduct was prejudicial and thus prevented the complaining party from having a fair trial. (*People v. Nesler, supra,* at pp. 582–583; see *English v. Lin* (1994) 26 Cal.App.4th 1358, 1364 [31 Cal.Rptr.2d 906].) In undertaking this review, we consider " ' "[(1)] the strength of the evidence that misconduct occurred, [(2)] the nature and seriousness of the misconduct, and [(3)] the probability that actual prejudice may have ensued." ' " (*English v. Lin, supra,* at p. 1364.)

Here, we conclude the trial court's findings the District received a fair trial and was not prejudiced by any of the asserted misconduct are supported by substantial evidence. We further conclude from our own review of the record there is no "reasonable probability" of prejudice based on the strength (or weakness) of the evidence proffered by the District and the nature of the misconduct. Indeed, the District's own counsel admitted during oral argument in connection with the new trial motion that the District could not determine the "impact, *if any*" the withheld information had on the jury. (Italics added.)

In addition, the record shows the jury policed itself when a juror (not necessarily Lindsay-Dial) briefly mentioned during deliberations the issue of White supremacists at PHS. Juror Burrows's testimony, which is uncontradicted, noted the statement regarding White supremacists "was snuffed quickly as a number of people stated that the jury was not there to consider those issues." Assuming arguendo the existence of juror misconduct here, this

evidence shows such misconduct did not influence the jury or otherwise prevent the District from receiving a fair trial. Thus, the court properly denied the District's new trial motion.

### III. *ATTORNEY FEE AWARD*[29]

Plaintiffs cross-appealed the trial court's denial of their motion for attorney fees under Code of Civil Procedure section 1021.5, a codification of the private attorney general doctrine. Although the trial court denied plaintiffs' request for attorney fees under that statute, it granted their request for fees under title 42 United States Code section 1988 and awarded plaintiffs $421,357.[30]

Although plaintiffs do not directly challenge the amount of fees awarded them under title 42 United States Code section 1988, by seeking reversal of the court's denial of fees under Code of Civil Procedure section 1021.5, the net effect is to require a reconsideration of the amount of the fee award. Plaintiffs admitted that while they sought fees under both statutes, the fee award "can be made on the basis of either [statute] alone."

Plaintiffs sought attorney fees in the amount of $336,800, based on 1,528 hours of legal work by their counsel. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133 [104 Cal.Rptr.2d 377, 17 P.3d 735] (*Ketchum*) [reasonable attorney fee award is based on the reasonable hours spent on a case multiplied by the hourly prevailing rate for private attorneys in the community to arrive at a lodestar figure].) In addition, they requested a lodestar multiplier of 1.7 to account for the degree of difficulty and risk in pursuing this case, for a total award of $572,560.

At the attorney fees hearing, the trial court made the following findings, which we conclude are supported by the evidence in the record: "In this particular case, the Court has carefully reviewed the billing submittals by plaintiffs' counsel. The Court finds specifically, after doing a reasonable, carefully calculated and conscientiously measured assessment of the time and billing records, that those records have been duly prepared, that they do not appear to be other than reasonable and necessary for the services provided. The court finds no evidence of overbilling or erroneous billing or padding, save and except two hours[,] which the court will deduct related to the publicity [of the case]."

---

[29] As we previously noted, the defendants have abandoned their appeal of the attorney fees order, except to the extent that a reversal of the judgment negates that award.

[30] Congress has authorized the discretionary award of reasonable attorney fees to prevailing parties in certain civil rights cases, including actions brought under title 42 United States Code section 1983. (See 42 U.S.C. § 1988(b).)

The court also noted that the hourly rates charged by plaintiffs' counsel were in the "low range of fair and reasonable of those customarily assessed in the community," and that defendants did not challenge those rates as excessive. In determining whether to include a multiplier, the court noted it would be guided by principles of federal law because "the rights vindicated pursuant to the uniquely federal statute [title 42 United States Code section 1983], when that cause of action is brought in a state court, ought not to have a different fee determination depending on in which forum those rights are vindicated."

Based on the federal analysis, which the court noted did not preclude an enhancement, and a series of other factors including novelty and difficulty, the skill required to perform the legal services properly, the hourly rates charged by plaintiffs' counsel, the results obtained, the nature of the case and awards in similar cases, among others, the court concluded that a 0.25 multiplier was warranted. The court thus arrived at the amount of $421,357.

▆▆▆ A trial court has broad discretion to determine the reasonable amount of an attorney fee award, including whether to increase or decrease the lodestar figure. (*Ketchum, supra,* 24 Cal.4th at p. 1132; *Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1240 [66 Cal.Rptr.3d 680].) The lodestar "may be adjusted by the court based on factors including . . . (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award. [Citation.] The purpose of such adjustment is to fix a fee at the fair market value for the particular action." (*Ketchum, supra,* 24 Cal.4th at p. 1132; see also *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 834 [112 Cal.Rptr.2d 284] ["no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation"].)

We conclude the court acted within its discretion when it added a 0.25 multiplier to the base amount of fees awarded plaintiffs, particularly in light of its finding the hourly rate of plaintiffs' attorneys was in the "low range" of reasonable. The record reflects a thoughtful and detailed analysis by the trial court of the various factors in determining whether to modify the lodestar figure. " 'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong["] '—meaning that it abused its discretion." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511].) We thus affirm the award of attorney fees.

## DISPOSITION

The judgment for plaintiffs Ramelli and Donovan is affirmed, including the award of attorney fees in the amount of $421,357. Plaintiffs are entitled to costs on appeal.

McConnell, P. J., and Benke, J., concurred.

A petition for a rehearing was denied November 4, 2008.